**CAROLINA POWER & LIGHT CO. v. SOUTH CAROLINA PUBLIC SERVICE AUTHORITY et al.**

**SOUTH CAROLINA POWER CO. v. SAME.**

**BROAD RIVER POWER CO. v. SAME.**

Nos. 860, 862, 864.

District Court, E. D. South Carolina.

Sept. 2, 1937.

R. T. Jackson, of Cleveland, Ohio, W. M. Rogers and Douglas Arant, both of Birmingham, Ala., and W. II. Weatherspoon, of Raleigh, N. C., for plaintiff Carolina Power & Light Co.

Arthur R. Young, of Charleston, S. C., for plaintiff South Carolina Power Co.

W. C. McLain and Elliott, McLain, Wardlaw & Elliott, all of Columbia, S. C., and Bolling Powell, Jr., of Birmingham, Ala., for plaintiff Broad River Power Co.

W. J. McLeod, Jr., and R. M. Jefferies, both of Walterboro, S. C., for defendant South Carolina Public Service Authority and its members.

John W. Scott and F. J. McNamara, Sp. Assts. to Atty. Gen., Department of Justice, Enoch E. Ellison, Department of Justice, Jerome N. Frank, Wm. J. Dempsey and Robt. E. Sher, Asst. Counsel, Power Division PWA, and Oswald Ryan, Gen. Counsel to Federal Power Commission, all of Washington, D. C., for defendants Ickes and Hopkins.

Christie Benet and Benet, Shand & McGowan, all of Columbia, S. C., amicus curiæ for Columbia Ry. & Nav. Co.

GLENN, District Judge.

These three suits were brought separately but were later consolidated for purposes of trial. This consolidation was inevitable and proper as every one seems to have conceded. There were the usual preliminary motions, perhaps more than in any other cases. At first interlocutory injunctions were sought. This necessitated a hearing on the question of whether or not section 380, title 28, U.S.C.A., applied. This motion turned upon the question of whether or not the defendants, South Carolina Public Service Authority and its members, were or were not "state officers" within the meaning of that section. It is needless here to do more than refer to this interesting question. This court was of the opinion that the defendants were state officers and that section 380 did apply. A three-judge court was convened. Then the plaintiffs, seeming to desire a trial before one judge rather than three judges, withdrew their applications for interlocutory injunctions. This withdrawal was allowed by the three-judge court and the case came back to one judge for trial. Of course, no interlocutory injunction was needed, as the very pendency of the suits and the hundred or more other suits of like nature pending in the federal courts of the United States operated as a "de facto" injunction. Such factual injunction was in practical effect just as effective for the plaintiffs as one signed by the judge and bearing the seal of a court.

There were interrogatories submitted under Equity Rule 58, 28 U.S.C.A. following section 723; motions to make more definite and certain were made. Immediately on the eve of trial several motions with respect to pleadings and depositions were made and ruled on. Most surprising of all was the motion made Monday, March 2, by the defendants for a continuance. After this court had been asked to push the cases on for trial and heard matters in season and out of season to get the cases ready for trial, and always at the insistence of the defendants, it was most surprising to be faced with a motion for continuance at the last minute. Long, hard, and important cases are seldom completely ready for trial and the court felt the necessity of going forward with the trial as the questions were important and the public interests of South Carolina were involved. It is useless to rehash here the various contentions on these preliminary motions. The cases came on for trial. Trial was had, lasting from beginning to end over a period of 10 weeks and actually consuming 8½ weeks of time in trial days. Testimony taken is well over 10,000 pages. Exhibits, consisting of maps, charts, and documents, literally fill a truck. Many of the exhibits are themselves books and documents running into the hundreds and thousands of pages. The questions involved were so important and varied that days would be taken in dealing with one phase of the case. To attempt to outline the issues in brief space is impossible.

As has been pointed out elsewhere, these cases involve all of the constitutional issues involved in other suits where federal funds appropriated by the Congress are being used under loan and grant agreements to construct municipally owned power plants competing with existing power companies. The magnitude of this Santee-Cooper project is such that it might be called a little TVA. On the other hand in legal nature it does not bear a close resemblance to the TVA. In the TVA project we have an origin confessedly legal arising out of the war power of the federal government. The commerce clause in its power over navigation also gave the TVA project a confessedly legal origin. Here we are not dealing with the development of an existing power plant, but with the creation of an entirely new one. Here the river involved is technically navigable, but practical navigation has at this time been entirely abandoned. Likewise the navigation features of the project itself are the subject of much contention. One of the main arguments of the complaining power companies is that the navigation features of the project are merely colorable and pretensive; that actually the main reason for the project is the development of water power and that the navigation elements are injected merely to

lend legality to the project. We will, of course, in our findings of fact, conclusions of law, and elsewhere in this opinion develop these questions more fully.

In the trial of the case it was also necessary to go fully into the question of cost. The statute provides that such projects, when aided by federal funds, shall be reasonably secured. Likewise it is apparent that the existing or promised appropriation must bear some reasonable relation to the actual cost of the project. The project in the language of the statute must also be feasible. A mere pipe dream, impossible of actual accomplishment, though otherwise legal, is not justifiable under this statute. The attack on the practicality of the project was made from several angles. One of the most interesting angles of attack involved a study of geological formation of the territory involved. In short, it was contended that the country was so full of soluble limestone channels and sinkholes that it would be impossible to impound the large quantities of water necessary to fill the two extensive reservoirs. Again it was contended that the foundations on which the concrete dams, power houses, and spillways were to be placed were of such uncertain composition as to endanger the superstructures. This criticism of the project from a geological standpoint had been made many years ago, and as a result the testimony covered findings which had been made by many different geologists, surveyors, and drillers over a period of 20 years. Three very eminent geologists testified. Dr. Kerr, an eminent geologist from Columbia University, New York City, devoted much time to a study of this area and the evidence submitted to him by many witnesses. The deposition of Dr. Meade, head of the department of geology at Massachusetts Institute of Technology, was taken. On the record his qualifications were shown to be most unusual and he must necessarily be considered as a witness of the highest ability and integrity. Most impressive and interesting, however, was the testimony of Dr. Taber of the department of geology in the University of South Carolina. Dr. Taber has been studying this proposition for 10 years and has spent months in the area involved. He was at all times aided by a number of assistants, and therefore was able to get evidence on every phase of the geological questions involved. Dr. Calhoun, geologist of Clemson College, was also presented as a witness, and, while he had not studied the question as thoroughly and intimately as Dr. Taber, nevertheless his testimony was very definite and helpful to the court.

The question of the cost of the project also brought much expert testimony into the trial. Leading construction engineers and leading accountants, all familiar with hydroelectric plants and their operation, were present as witnesses. The cost elements were analyzed in detail. A great divergence of opinion was found on many elements of the cost, and indeed it is well-nigh a vain hope to believe that a single judge can weigh the testimony on all phases of such a case and be able to say with any accuracy which testimony is more reasonable and creditable. But the method of trial provided for these cases is built upon that theory of the fact finding capacity of one individual judge, and so we must address ourselves to the task of deciding these questions of fact. It matters not how highly technical or how involved are the scientific questions, the judge must decide which of the witnesses is telling the truth about the matter. However, it is fortunate that this court knows the territory involved and has some knowledge of the many questions coming up for decision in this case. One of the most troublesome questions is the cost of the land which is to be purchased for the two reservoirs, and as this element of the cost is the largest single element the findings thereabout will be very important on the whole question of cost.

It is well also at the outset to refer to the characteristics of the Santee river system. The Santee system is made up of three major rivers which rise in the mountains popularly known as the Blue Ridge and flow towards the sea. These rivers are from north to south the Catawba-Wateree, the Broad, and the Saluda. The Saluda and the Broad combine at Columbia, S. C., to make the Congaree. This confluence takes place at the fall line, the divide between the Piedmont and the coastal plains. The Congaree then flows in a south-easterly direction and joins with the Catawba-Wateree to form the Santee proper. The Santee then flows through the coastal plains of South Carolina for a distance of approximately 100 miles. The Santee then empties into the Atlantic Ocean just south of the city of Georgetown, S. C. The area drained by the Santee is in the shape of a funnel,

being very wide in its upper portions and converging into a veritable neck near the sea. At the widest point from Anderson, S. C., to Statesville, N. C., the area drained by the Santee system is about 150 miles wide. As the Santee nears the sea its drainage basin is very much narrower. From Rimini to the coast the area drained will average little more than 20 miles in width. Coastal rivers to the north and south spring up and drain the territory immediately adjacent to the Santee drainage area, and these streams flow independently into the ocean. At one point the drainage area of the Santee is not over 15 miles wide.

The Cooper river, being the coastal river with which we are concerned, is little more than a tidal estuary. The main stream of the Cooper rises at a point not more than 6 miles from the southern bank of the Santee river channel. The divide between the Santee river basin and the Cooper river basin is a flat, swampy plateau averaging from 85 to 90 feet above sea level. It will be seen, therefore, that to divert water from the Santee river proper into the Cooper river will involve transfer of water across this divide into a watershed lying completely in the coastal area. The Cooper river flows in a southeasterly direction and empties into the ocean at Charleston, S. C. Charleston Harbor is formed where the Cooper and Ashley rivers flow together and empty into the ocean.

Tidewater on the Cooper river reaches very far inland and practically to the point near Pinopolis, where it is proposed to construct the powerhouse for this project. The testimony shows that the Santee river has an average flow, at the proposed point of diversion, of approximately 19,200 c. f. s. The proposal is to divert all of this water except 500 c. f. s. by means of a diversion dam and a diversion canal. This will of course transfer the major part of the flow from the Santee river into the Cooper river. It is conceded that the average amount of water diverted from the Santee river to the Cooper river will be 22 times the amount left to flow in a normal way through the lower reaches of the Santee river. Thus, except in times of flood, the lower reaches of the Santee river will carry to the sea a very small amount of water. This small amount of water will not be sufficient to maintain the Santee in its present navigable state, and the inevitable effect of the project will be to practically destroy the lower reaches of the Santee as a navigable stream.

The bare statement in bold outline of the foregoing situation immediately calls to our attention the fact that an issue is presented in these suits which is not present in many of the suits involving the loan and grant agreements whereby the federal government is aiding in the construction of municipal power plants. We know of no other suit involving a project where it is proposed to divert the major part of the flow in one stream across a divide into an essentially separate and distinct watershed. Charleston Harbor, where the water from the Santee, if diverted by this project, will flow into the sea, is approximately 60 miles south of the present mouth of the Santee river. It is well to point out even in the beginning, however, that the navigation on the lower reaches of the Santee has never been very satisfactory, and at the present time is practically nonexistent. The defendants contend that navigation will be much better served by the proposed route through the Santee reservoir, the diversion canal, the Pinopolis reservoir, and the much enlarged and improved Cooper river. The difference in elevation involved will be taken care of by locks to be erected at Pinopolis. A full discussion of the evidence on this score and the balancing of conveniences is reserved to the place in our opinion where we discuss the questions of law involved in this phase of the case.

This court, shortly before trial, allowed amendments to the original bills which brought into question the power of the Federal Power Commission to grant a license such as the one involved in this case. This made it proper for the Federal Power Commission to intervene as amicus curiæ and the issues dealing with this question have been ably presented and argued both by counsel for the plaintiff and by counsel for the Federal Power Commission.

## Analysis of Legal Issues.

These suits present the same legal issues which are presented in the PWA cases generally, and in addition thereto legal issues with respect to the powers of the Federal Power Commission. Also certain legal issues are presented which arise under the Constitution and statutes of South Carolina as well as the "common law" as enforced in the South Carolina courts.

We therefore discuss these issues under three main heads:

First, issues of the constitutional law common to PWA suits generally.

Second, issues dealing with the powers of the Federal Power Commission and the legality of the license originally issued to the Columbia Railway & Navigation Company and assigned to the present South Carolina Public Service Authority.

Third, issues of law arising under the state law, State Constitution, state statutes, and state common law.

Issues common to PWA suits generally:

The threatened competition complained of in these suits will not be that of a local power plant owned by a city with an existing privately owned utility, serving the same territory. We point out that the competition involved here is that of an enormous project with three large power companies. The threatened competition will cover an area, admitted by the defendants' testimony, to extend from Jacksonville, Fla., via Augusta, Ga., to Columbia, S. C., and thence eastward to Bennettsville, Florence, and Wilmington. When the project is completed and operated at full tilt, its competitive effect will be felt throughout an area with a radius of 200 miles from Pinopolis, the site of the proposed powerhouse.

■ Such competition will tend to displace the South Carolina Power Company entirely. It will invade a large part of the territory served by the Carolina Power and Light Company, and will invade all of the territory served by the Broad River Power Company. It is idle to deny that there will be serious competition to the existing companies. The only escape from the conclusion that such competition will seriously hamper, even destroy, the three named companies, is the enormous increase in consumption of power which some of the testimony prophesies. We can only judge of the future by the past, and this court refuses to shut its eyes to the evidence which justifies a prophecy of the continued enormous expansion in the consumption of power. This court believes that the evidence justifies the conclusion, by the greater weight thereof, that such expansion will continue at the rate the evidence shows has prevailed during the last 25 years. This court believes that we are even yet in the infancy of the electric power consumption. Daily, new uses for electricity are being found in industry and household alike. Courts must decide cases involving issues, however important, by the greater weight of the evidence. When a fact is to be decided, that fact, whether it involves the decision of what has already happened or what in all probability will happen, must be decided by the standard of evidence prevailing on the civil side of the court, "the greater weight of the evidence." We know of no other satisfactory way in which to decide cases before the court.

An illustration coming from the testimony in this case shows most graphically how the consumption of power has increased in this very area. An accepted graph shows that the power consumed in January, 1920, was just one-third of that consumed in March, 1933. Any one familiar with the business life of this area knows that January, 1920, was an all-time high and that March, 1933, was the time when business conditions were at their worst.

■ As we have set forth fully in our findings of fact, there is no escape from the conclusion that the competition of the finished plant will practically destroy the South Carolina Power Company; will seriously injure the Broad River Power Company; and will affect to a large degree the business of the Carolina Light & Power Company. That the only escape from such damaging effect, if the rates of the new project are appreciably lower than the rates of the present companies, will be a phenomenal increase in the consumption of the power in the 200-mile area. We must, therefore, in dealing with the decision of the case, accept as the more probable course that the plaintiff companies are going to be seriously damaged, unless some unforeseen legislation, change in conditions, or amicable division of business with the Authority comes about. The question, therefore, must be decided on the basis of whether or not this impending damage is illegal. This court has had occasion in the Greenwood County Case (Duke Power Co. v. Greenwood County), 19 F.Supp. 932, to point out that it follows as persuasive authority the decision of the Circuit Court of Appeals for the Fourth Circuit in the first Greenwood county appeal, 81 F.(2d) 986. Now, this persuasive ruling has become binding authority, the Circuit Court of Appeals for this circuit having in the second Green-

wood county appeal, 91 F.(2d) 665, reaffirmed its previous ruling. This ruling has not yet been before the Supreme Court and, under the principle of stare decisis, this court must follow the ruling laid down there. In the Greenwood County Case the damage resulting was very slight. Here, the damage will be very great, but, as this court views the decision of the Circuit Court of Appeals, this difference in degree makes no difference in the application of the legal principle involved. The court has said that from such competition, however damaging, no right to injunction will arise. What was said there is here binding on us and, regardless of any doubts which we may have had about the competition giving rise to a remedy of injunction, we are now precluded from entertaining these doubts. However, we do not understand the opinion of the Circuit Court of Appeals in the second Greenwood County Case to reverse the conclusion of law which this court made in its decision in the second trial of the Greenwood County Case; namely, that in addition to the asserted right to be free from competition, the local power companies have a right to have their intrastate activities regulated by state authority. Federal agencies have no right to regulate these intrastate activities, even though federal regulation may be more beneficial to the utility than state regulation. In short, the plaintiffs have a right to carry on their intrastate activities free from any restraint or control except that control which is exercised by proper legal authority. This right being asserted and supported by testimony, we conceive that the plaintiffs have a right to go forward with the trial of the case on these legal issues, although the ruling may be against them on what might be called the purely competitive elements of the case.

As we shall develop fully elsewhere in this opinion, the asserted rights arising from the alleged invalidity of the license issued to the Columbia Railway & Navigation Company and assigned to the defendant Authority would still keep the plaintiffs in court. Therefore, for two reasons this court is of the opinion that a ruling in favor of the defendants on the competitive feature of the case does not decide the entire case. The damage due to competition itself may well be damnum absque injuria, but does not dispose of the other legal issues in the case. Shortly before the trial, the plaintiff companies, benefiting from experience in the trial of other cases and further study of the legal issues involved in such a case as this, applied to this court for an amendment to their bill which would raise definitely and specifically the issue of the legality of the license. This court was of the opinion that, as a matter of substance, the matter of the legality of the license had already been injected into the case as an issue. The view which the court took of these proposed amendments was that no element of surprise was being injected into the case; that the substance of the proposed amendments was simply to point out specifically what statutes and constitutional provisions were alleged to be violated by the license. The amendment named the River and Harbor Act (46 Stat. 918), the Federal Water Power Act, as amended, 16 U.S.C.A. §§ 791a–823, and the definite provisions of the Constitution, safeguarding control of intrastate property to the states themselves. It will be seen that these amendments were important, far-reaching, and, if not tried in this case, would have necessitated another trial wherein much of the evidence taken as to the physical features of the project would have to be taken again. All those considerations which are back of the sound requirement of trying in one case all of the issues necessary for a complete decision between the parties and growing out of the same major set of transactions support the decision of this court to allow these amendments and to try these issues along with the others in one suit. The attorneys in the trial of the case for both plaintiffs and defendants recognized the propriety of this action and, in argument and filing of brief, seemed to have well-nigh conceded to the correctness of the court's decision in allowing these amendments. The Federal Power Commission was allowed to intervene before the trial as amicus curiae. Their counsel took part in the argument and filed an extensive and able brief supporting the position of the commission. The Columbia Railway & Navigation Company, the orginal licensee, was allowed to appear as amicus curiae and an order to this effect was signed during the course of the trial. Their able and experienced counsel sat through the major part of the trial. Therefore, it cannot be contended that the legal rights of the defendant Authority have, in any way, suffered from the allowance of the amendments. The trial took 8 solid weeks and it is common sense that in such a long, expen-

sive, and extended trial every necessary issue should be raised and disposed of.

So far as the unlawful regulation of the plaintiff's intrastate business by the device of purchased compliance and subsequent regulation is concerned, this court holds as it did in the Greenwood County Case that there is a failure of the evidence to make out a case. This court is still of the view that the changes in the contracts from those first entered into by the government agencies to those later used in the particular form involved in this litigation were important changes and were made with the desire and effect of removing legal infirmities from the contract. The majority opinion in the second Greenwood county appeal certainly does not contradict this view of the case. If we were right in our views in the Greenwood County Case on this legal issue, we are right in taking the same view in this case. The power which the administrator, federal officer, has over rates and operations of the plaintiff companies in this case is no larger than the power which he has over the rates of the Duke Power Company, plaintiff in the Greenwood County Case. It is said that the injection of this issue in the case is not substantial. Several courts have decided somewhat similar cases without going into this question at all. This court outlined at greater length its views on this question in the opinion and conclusions of law in the Greenwood County Case. We thought it was a question necessary to the decision of the Greenwood County Case, and we think it is a necessary question here. Certainly, regulation and control by government agency involve some damage and expense to a public utility serving thousands of people over a wide territory. This control and interference with the freedom of the utility constitutes a substantial element of damage. Such control and interference, if by an agency that has no constitutional authority to exercise the control, is illegal and, therefore, the two elements necessary for injunctive relief would certainly be present if, as a matter of substance, the loan and grant agreement and the construction of the project resulted in control and management of the plaintiffs' intrastate activities. We think the issue is present; the Circuit Court of Appeals for the Fourth Circuit in the second Greenwood county appeal did not remove the issue from the case and, therefore, until the Supreme Court rules on the matter, we adhere to our view that this legal question is in these cases.

For further elucidation and discussions of our views thereabout, we invite attention to the opinion of this court in the case of Duke Power Company v. Greenwood County et al., 19 F.Supp. 932.

The foregoing may appear to be a somewhat brief opinion on the important element of right to sue or right to injunctive relief in these three important cases, but we point out that this phase of these cases has been discussed in some half dozen cases by the district and appellate courts. The views of the courts on both sides of this question have been set forth with ability and clarity. In this Circuit Judges Parker and Northcott have set forth the majority view on three occasions. Judges Soper and Watkins, with great force and clarity, have set forth the minority view. Any further discussion of these legal questions and citation of the same authorities which have been cited several times would, in our judgment, simply be a rehash of the same legal questions, and would serve no useful purpose. The Court of Appeals for the District of Columbia in the Alabama cases disposed of the appeal almost entirely on the question of the right to bring the suit. Alabama Power Co. v. Ickes, 91 F.(2d) 303. These cases are now in the Supreme Court and the final word on this controverted subject will be had when the Supreme Court rules on the appeals in the Alabama cases.

Stare decisis is sufficient ground for us to follow our previously announced views in this regard.

Issues of law arising out of the legality of the license issued to the Columbia Railway & Navigation Company and assigned to the South Carolina Public Service Authority:

At the outset of our consideration of the legality of the license issued to the Columbia Railway & Navigation Company and proposed to be transferred to the South Carolina Public Service Authority by an existing agreement, we are faced with a question very similar to the question involved in the competition phase of the case. In short, the contention of the Federal Power Commission is that the plaintiff companies here are without right to question the validity of the license in this suit. The argument is that the same reasons which would prevent a suit from being maintained by reason of illegal

financing of a competitive project would prevent a suit to test the legality of a license to erect the same project. In short, it is said that the only damage which will be provided by the Santee-Cooper project, even though the license for the project be illegal, would be damage resulting from competition, and, under the doctrine of the cases dealing with this question, no right to injunction would arise.

We do not agree with this contention. We think that the question here is slightly different. Certainly, as to the plaintiff Carolina Power & Light Company. This plaintiff itself is a licensee of the Federal Power Company and as such licensee has the right to be protected from competition by another agency which does not have a legal license. To state our legal position briefly, we think the case, certainly so far as the Carolina Power & Light Company is concerned, comes within the doctrine of Frost v. Corporation Commission Case, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483. Where a commission is set up by Congress or by a state Legislature with valid authority to issue licenses and control all of the projects to be erected in a given line of business, it would seem that those agencies which are licensed should be protected from destructive competition at the hands of other agencies who have not complied with the law regulating the issuance of the license. Then, too, their day in court would only become important when it became necessary to question the legality of such license by reason of the imminent danger of damage.

The facts in the history of this project illustrate this principle with great force. For many years the idea of developing the Santee-Cooper project for power purposes was visionary because of the lack of funds of the owners of the license. Then, for years, the license was held by a security corporation which took no interest in the development of the power project; but, when the license was about to be taken over by the combined forces of state and nation, and the president of the United States had signed a letter in which he solemnly promised that the enormous sum of $37,500,000 would eventually be allocated to the construction of this project— that was the day when the Carolina Power & Light Company took notice and took steps to protect itself. Its action was no longer premature; the damage was about to be done; and delay on its part would

have been fatal. So we think that certainly the Carolina Power & Light Company, under the doctrine of the Frost Case, has a standing in court to question the legality of the license.

Again we reassert our view that every citizen has a right to be free from federal control or regulation of his business and rights in matters of intrastate concern. If, therefore, the project will seriously interfere with and regulate in a substantial way the business of the plaintiff companies and if the project has not been legally licensed, we think that the plaintiffs would be entitled to an injunction. The proposition is similar to the proposition which we have set forth at full length in the opinion in the Greenwood County Case and referred to in the previous part of this opinion. We subscribe, in short, to the following doctrine that, if a citizen is subjected to regulation of his business or property by a governmental agency which has no power or jurisdiction to exercise this regulation or control, he may, in equity, enjoin such usurpation of power without proof of the extent of his monetary damage.

Of what avail would a willing compliance with a regulatory statute be if a person is not to be protected from the man who would damage his business without complying with the statute?

But, even if we are wrong in bringing this phase of the case under the doctrine of the Frost v. Corporation Commission Case, we think that to decide this case on the trial thereof on this question would be a mistake. Suppose this court is right in holding that the Frost Case does govern and failed to make findings of fact and conclusions of law on the disputed questions of fact and law, the affirmance of the court on the procedural right would leave the question undetermined on the merits. We remind the reader of this opinion that this case consumed 8 actual trial weeks, and, according to facts of which the court can well take judicial knowledge of, has cost the parties altogether well-nigh one-half million dollars. Certainly, to fail to go forward and make factual findings in such a case would be an abuse of discretion. We have precedent for our course in that the Circuit Court of Appeals in the Greenwood County Case has, on both occasions, dealt not only with the question of right to sue but with the factual and legal questions involved.

The attacks on the validity of the license may be summed up into two major propositions. First, that the federal Congress has not, under the Constitution, power to confer upon the commission the right to issue a license such as the one issued to the Columbia Railway & Navigation Company; that Congress itself could not authorize the project, and hence it could not confer power upon the Federal Power Commission to authorize it. Second, that, even if Congress has the power to authorize such a license and has the power to confer control over such a project upon the Federal Power Commission, then it has not done so by the statute creating the Federal Power Commission, defining its duties and vesting power in it.

To appreciate these two arguments, we must call attention at the very outset to the fact that the license here authorizes the "diversion" of practically the entire natural flow of the Santee river at a point 87 miles above its mouth. It further authorizes the "diversion" of this water completely across an existing watershed into a much smaller stream which flows into the ocean 60 miles from the natural mouth of the present Santee river. The details of the situation are fully brought out in our findings of fact and we do not repeat them here. The unusual feature, and the one which the plaintiffs contend is so unusual as to be beyond the power of Congress to regulate and at least beyond the power vested in the Federal Power Commission by the creative statute, is the diversion over a watershed. It is pointed out that actually this question has never been decided by the Supreme Court of the United States. The able brief on this phase of the case filed by counsel for the plaintiffs discusses the situation and cites many cases. This discussion and argument is summed up in the following way on pages 210, 211 of the brief:

"From a review of the foregoing authorities (which include all authorities cited on oral argument by the defendants even though deemed to be clearly inapposite), it is plain:

"First, that congress has never attempted to authorize the diversion of a navigable stream and the consequent destruction of its navigable capacity even for the creation of a navigation route in another watershed.

"Second, that although the question has frequently been urged upon the supreme court, the supreme court has always declined to decide whether congress has the power to destroy the navigable capacity of a navigable stream even to create a navigation route in another watershed.

"Third, that whether the congress has the power to destroy the navigable capacity of a navigable stream even to create another navigation route in another watershed, is at least a matter of grave constitutional doubt, and

"Fourth, that plainly congress has no power to divert a navigable stream and destroy its navigable capacity to create a hydro-electric power development in another watershed, or for any purpose other than navigation."

We have, as best we could, studied the decision and the record available in the Chicago drainage canal cases; but it seems to us from the study we have made that the identical question is stated but not decided therein. Therefore, we must decide this question in the first instance. It seems that the key to a correct understanding of this argument is found in the principle announced by the Supreme Court in many cases and summed up in a pithy way by Justice Cardozo in the Schechter Case (Schechter Poultry Corporation v. U. S.), 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947—that courts are not indifferent to considerations of degree. It is true that the Constitution nowhere specifically authorizes Congress in the exercise of its power over interstate commerce "to change the face of the earth and make great rivers out of small ones, and small ones out of great ones," neither does the statute creating the Federal Power Commission specifically authorize projects which lift water from one watershed to another and send it to the ocean by a route far distant from that ordained by nature. But here we are dealing with a project located entirely within the bounds of one state. That state has, by its Constitution, authorized its Legislature to permit many changes in its natural water courses. See article 1, section 28, page 1025. That Legislature has, by the act creating the Public Service Authority Act S.C. April 7, 1934, 38 St. at Large, p. 1507, solemnly authorized the specific diversion here in question. We are not dealing here with a certificate of public convenience and necessity issued by an administrative body; we are dealing with a statute passed directly by

the Legislature and authorizing this specific project. It is well understood by every student of government that such a statute is the highest kind of certificate of public convenience and necessity. Therefore, so far as limiting the powers of Congress over this particular river is concerned, the only effect of such limitation would be to put the complete power back in the hands of the state. The state has, by its highest authority, approved this project, and who, then, can complain? We comment, in passing, that the project has been up for consideration before the South Carolina Supreme Court (Clarke v. South Carolina Public Service Authority, 177 S.C. 427, 181 S.E. 481), and it has held that the project is legal in all of its phases.

The balancing of the damage to the riparian owners on the lower Santee against the benefits to South Carolina at large, and to Columbia and Charleston in particular, is a question of policy for the state Legislature, and it has spoken on this subject; its decree thereabout has been approved by the highest state court. This seems to us to dispose of all attempts to base the charge of illegality on the violation of any State Constitution or statute. But, we think that the only common-sense view of the evidence compels us to hold that, so far as the project involves navigation, it is a project which so substantially affects interstate commerce as to be one over which Congress plainly has power of control. We only point out that all of the testimony about the proposed navigation contemplated interstate and foreign commerce as being the major part of the commerce to move over the new waterway. Likewise, practically all of the commerce previously moving over the lower reaches of the Santee was interstate commerce.

When the Constitution gave Congress power over interstate commerce, and when Congress exercises that power by requiring a license for power projects to be erected on navigable stream on which interstate commerce was to move, and when a court is called upon to construe a statute by which such power is exercised, it must be done with common sense. To dam up the Ohio river immediately below Pittsburgh, and, by tunnel or canal of gigantic proportions, turn that water into the upper reaches of the Potomac would probably be such a diversion and changing of the face of the earth, and so vitally affect the lives of the people in the states of Ohio, Indiana, and Kentucky as to be beyond the power of Congress. But, here we have, when viewed from a practical standpoint, the partial destruction of the navigability of the lower Santee and a resulting benefit of a greatly improved navigation from midland to the sea—in addition to the construction of a great power plant which the Congress has declared to be for the general welfare of hundreds of thousands of people.

Courts are not indifferent to considerations of degree. This same maxim stands us in stead when we go to consider the watershed over which the water is to be diverted. It is important to remember that at this stage the Santee river itself is little more than a drainage pipe. It simply has swamps on each side of the main channel which act as safety valves to prevent undue high water and to allow a slow runoff. The Cooper river on the other hand is little more than a tidal estuary, draining a small area and most of this marsh land and swamps. The divide, which assumes such an important proportion from a legal standpoint, is, in fact, only 10 or 12 miles from the main channel of the Santee and is only 40 feet above the channel of the Santee river. The divide itself is a plateau so level and so swampy that its actual location is impossible of accurate delineation. The 5-foot contours on the accurate maps are at places miles apart and the theoretical divide becomes a matter of very small importance. As we have shown in detail in our findings of fact, the importance of the lower reaches of the Santee as a navigable stream is practically negligible, both to the shipping public at large and to the riparian owners. Georgetown, a city of 4,000 people near the mouth of the Santee, will, in fact, be benefited rather than damaged, so far as navigation is concerned. Supply of cheap power to this city which has recently had some substantial increase in its industry will certainly be an advantage offsetting the loss of a theoretical navigability of the lower Santee.

So, when we construe the word "diversion" in a common-sense way and get at the spirit of the matter rather than at a technical dictionary meaning of the word, we think that it covers such a project as this. The argument that a watershed is involved seems, under the facts of this case, to be a technical one rather than one of substance, as in the case of Piedmont

& Northern Railway Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115.

We get at the fundamental spirit of the legislation when we wish to construe particular words. We refuse to stick in the bark of technical definitions.

A court must always have in mind, in ruling upon cases of this character, the warning so often given to it by the Supreme Court; namely, that its function is to decide on questions of power and not questions of policy. An individual judge, much more than a higher court of nine members, should not allow his own ideas of economics and political philosophy to be injected into the decision of a question of constitutional power. There may be those of us who believe that it is best to encourage individual initiative and to allow capital coming from many investors to be placed in the hands of directors who will use it for the purpose of financing industry, that this industry should, of course, be controlled in its activities by state or nation; that nation, state, and municipality should confine themselves to strictly governmental function. But, the holding of such views should not blind a court to a clear conception of its duty when it comes to determine the powers of the federal Congress. It seems that the decision of the Supreme Court in the case of Brush v. Commissioner, 300 U.S. 352, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428. came at a very opportune time; there it was held that a commissioner of waterworks of the municipality of New York City was engaged in essentially governmental functions. The history of the water supply business was developed fully in the trial of the case and is discussed in the opinion. Then it is pointed out that the water supply business has come to be handled almost entirely by the municipalities themselves.

We think it both pertinent and proper to review very briefly the history of the electric power business. Certainly, there is sufficient evidence in this case, supplemented by facts of which a court would stultify itself not to take judicial notice, to enable us to summarize the history of this business in the areas involved.

Originally, electric power and its distribution and sale was handled almost entirely by the municipalities themselves. Local power plants, generally operated by steam, were built by the municipalities themselves. After several decades, the large power companies developed the hydroelectric sites available on the large rivers. With this power to sell, they gradually absorbed or displaced the municipal power plants. A ride through the Piedmont section of South Carolina, North Carolina, or Georgia will enable one to find in practically every town of 3,000 or more people an abandoned steam-generating plant. The business has been taken over almost entirely by the large power companies. The exception is the case of a community like Greenwood county or Charleston, where large steam-operated plants still remain. If the power companies found the business generally in the hands of municipalities when they came on the scene, there is certainly no novelty when they find that municipalities, large or small, desire to get back into the power business.

This question of the destruction of business and business values by reason of change in the method of doing business is the question which every individual, firm, or corporation must contemplate when he enters upon a given business. In the transportation world, railroads supplanted water transportation, except where carried on under most advantageous conditions. Motor transportation and concrete highways have very largely supplanted the railroads, and so the battle has gone on. So, no matter what concern we may feel as individuals for the stockholders in the power companies, they have never been given any guarantee, as a matter of law or fact, that states and municipalities may not go back into the business of generating, distributing, and selling electric power. The forces which bring about such changes are more powerful than the business interest involved and are changes which the court is powerless to enjoin. The late Justice Holmes, while sitting on the Supreme Court of Massachusetts, had this in mind when he wrote his opinion in a case dealing with the municipal sale of coal. Opinion of the Justices, 155 Mass. 598, 30 N.E. 1142, 1146, 15 L.R.A. 809. He said that a court was powerless to enjoin such activities on the part of a municipality. He pointed out that it was proper for a public body to offer for sale an article of general necessity. He said: "The purpose is no less public when that article is wood or coal than when it is water or gas or electricity, or education, to say nothing of cases like

the support of paupers, or the taking of land for railroads or public markets," then proceeded to point out that the wisdom and necessity of such legislation was a question of policy for the Legislature and not one of legality of power for the court.

Certainly, under the facts as they are developed throughout these long cases in a trial extending over 8 weeks, it is apparent that generation and sale of electricity may well be a proper activity to which municipalities may return. Investors who have, in the meantime, put large sums of money into privately owned properties may lose, and we may regret the loss, but they were at all times charged with the knowledge that there might come such a change in the general method of operating electric power plants.

In the early cases following the Transportation Act of 1920 (41 Stat. 456), the Supreme Court of the United States had several occasions to advert to this feature of the cases. What was then said about the right of the government to take over, control, and operate the railroads seems to us to apply now with equal force to government subsidy to municipalities who have decided to go back into the power business.

 The plaintiffs lay great stress upon the fact that the army engineers who, as a matter of history, have exercised supervision over navigable waters of the United States have not looked with favor upon this project. There is no doubt that there has been a policy firmly established by the Congress of the United States that all improvements on navigable waters of the United States shall be carried out under the supervision of the War Department. The Supreme Court of the United States has called attention to this well-established policy. In United States v. Arizona, 295 U.S. 174, 55 S.Ct. 666, 672, 79 L.Ed. 1371, we find: "In accordance with definite policy long pursued by it, the Congress has committed to the Secretary of War and Chief of Engineers all investigations, surveys and work in aid of navigation."

Likewise, there is no doubt but that the army engineers have failed to approve this project when viewed purely from the standpoint of improvement to navigation. However, this is no bar, as a matter of law, to the construction of the project.

There is nothing in the act appropriating money which, either directly or by reference, requires the approval of the army engineers. Then, too, in weighing the evidence, we must remember that we are called upon to view the project as a whole, whereas the army engineers, in dealing with the desirability from the standpoint of navigation, have very properly in mind the balancing of benefits against costs. Their point of view is that of the adviser to Congress and they have in mind the allocation of money to projects which will be of the most benefit for the dollars to be spent. It might have been well for Congress to have insisted that all PWA projects be passed upon by army engineers, but Congress did not do so, as we view the governing statutes. Also it must be remembered that Congress declared that the relief of unemployment was one of the major reasons for going forward with the PWA program. The point of view of the traditional army engineer in passing upon the advisability of a given project has never been that of providing employment for unemployed. In this case, the testimony of the officials having "unemployment in charge in South Carolina" shows that in the coastal counties within 50 miles of the Pinopolis powerhouse there are still thousands of unemployed, able-bodied inhabitants. While the problem of the unemployed is not as acute now as it was several years ago, and while it is not as acute in eastern South Carolina as in the more thickly settled areas, nevertheless, by actual count, it is shown to be more acute in Eastern Carolina than in the Piedmont. The evidence in the Greenwood County Case was sufficient to satisfy the Circuit Court of Appeals of the Fourth Circuit that the construction of the Buzzard Roost Plant had a definite and substantial relation to the relief of unemployment. A fortiori there would seem to be here a sufficient relation to the unemployment situation to justify the conclusion that the argument of relief to the unemployed is well founded.

Legality of the appropriation by Congress and allocation to this project of the money from the Federal Treasury:

 To sustain the legality of the appropriation by Congress of the money for this loan and grant, defendants rely, of course, upon the general welfare clause of the Constitution. Since the decision in United States v. Butler, 297 U.S. 1, 56

S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, the general welfare clause has, of course, come as a great ally to the movement which seeks to change the social life of the country by congressional aid. The aid, of course, generally takes the shape of money to be appropriated upon certain conditions to be complied with by the state agency. We have set forth our views about the general welfare clause in our opinion in the Greenwood County Case. That opinion was written some time before the decision of the Supreme Court in the social security cases was announced. We felt then and feel now that the key to a proper understanding of the general welfare clause is found in the consideration of the intimacy between the federal sovereignty and the state sovereignty. Surely, the states, in surrendering a portion of their sovereignty to the newly created federal sovereignty, had in mind that the surrendered authority would be used for the benefit of American citizens. We find nothing which gives any basis to the argument that, when Congress exercises a delegated power for the benefit of the citizens themselves, it was obliged to act through federal agencies alone. There is no command, direct or inferential, that the federal government should not act in co-operation with the respective state governments. In our view, so long as an arrangement between federal authority and the state authority does not vest in the federal authority powers which amount to a substantial control over matters of local concern, co-operation between state and nation is lawful. The nation cannot usurp power which is reserved to the state by the Tenth Amendment and the spirit of the whole Constitution. The state cannot surrender power and responsibility to the nation which is left by the Constitution with the state, the original sovereign unit. But this limitation on the power of the nation and on the power of the state does not mean that the two cannot act together, provided that the co-operative plan does not transfer power from the state to the nation. Federal aid to highways constructed by state road-building agencies is a familiar example. The appropriation is justified under the power over the postal service and the war powers. The plans for building the highways have in mind both the federal services and the needs of the local communities. So, here in the case of a nationwide depression, the appropriation is justified by relief of unemployment and by the building up of industry which will have a nationwide effect and finally to substantial benefits to the interstate commerce through the navigation features of the project. The plan involves co-operation with state agencies, but it does not, in our opinion, involve the transfer of authority to control and regulate business in South Carolina to the federal government. Through means of competition, the plaintiff companies may be forced to change their method of doing business, may be forced to lower their rates, but this is not the assertion of a regulatory power by the federal government. It is true that it may amount to the same thing from the standpoint of dollars and cents, but this damage comes solely through the channel of competition. The Circuit Court of Appeals of this circuit has held that such damage does not give rise to a cause of action. Duke Power Co. v. Greenwood County, 91 F.(2d) 665. We are not going further into a discussion of the general welfare clause because we deem it to be unnecessary. The higher courts, whose views we are adopting, have said that appropriations for WPA projects of this character are justified by the general welfare clause. The Supreme Court has not had occasion to decide this particular question. The general welfare clause (Const. art. 1, § 8, cl. 1), like any other clause of the Constitution, cannot be construed in a narrow sense. It cannot be taken apart from the other provisions of the Constitution. It, like any other clause, must be construed in the light of the fact that it is in the Constitution and must deal with change in conditions as well as any other clause of the Constitution. It is a broad grant of power and, until commanded to do so, we refuse to read it with an evil·eye.[1]

---

[1] After all, the Constitution was creating a new state. It was a federal state, but, none the less, it was a state with important duties to perform. The science of law has always recognized that any state to perform its duties must have a sovereignty commensurate with the duties placed upon the state. The definitions of a state, as given in court decision, recognize that the necessity of working for a common benefit is a necessary element in any state, whether its sovereignty be original or delegated, i. e.:

"A state, * * * a complete body of free persons, *united together for their common benefit*, to enjoy peaceably what

### Issues of State Law.

Little need be said about these questions. We have referred to them in parts of the opinion already written. We have pointed out that the question of the wisdom of destroying the navigability of the lower Santee in return for the other benefits of the project was a question of policy for the South Carolina Legislature. The South Carolina Constitution (Const. art. 1, § 28) clearly gave the South Carolina Legislature the power to pass a statute dealing with this matter (Act S.C. April 7, 1934, 38 St. at Large, p. 1507). All other questions of local law were dealt with in the suit brought before the Supreme Court of South Carolina entitled Clarke v. Public Service Authority, 177 S.C. 427, 181 S.E. 481. Of course, the present plaintiffs were not parties to this suit in the state Supreme Court, but that does not alter the fact that the South Carolina Supreme Court could there lay down the applicable law. We now take the substantive law as they have declared it and apply it in a suit where the plaintiffs are parties.

So far as questions of substantive rights of the plaintiffs arising out of the common law are concerned, these are discussed elsewhere in this opinion. So far as these questions have been brought up, they have been decided in both the South Carolina Supreme Court and in this court.

We therefore see no reason for granting an injunction in order to protect the rights of the plaintiffs arising from either the South Carolina Constitution, statutes, or common law as enforced in South Carolina.[2]

---

is their own, and to do justice to others." Chisholm v. Georgia, 2 Dall. 419, 456, 1 L.Ed. 440. (Italics ours).

"Law is something more than police. Its ultimate object is no doubt nothing less than the highest well-being of society; and the state, from which law derives all its force, is something more than an institution for the protection of rights, as it has not inaptly been described. It is, however, no part of our undertaking to discuss the question how far law may properly go in its endeavors to promote the well-being of those within its sphere. The merits of a paternal government, of centralization, of factory acts, of state churches, are topics for the politician rather than the jurist.

"With the advance of civilization the state naturally extends the sphere of its activity. It is represented by some writers as having been successfully devoted to war, to law, and to culture and well-being." Holland's Jurisprudence, p. 67.

2 The trial of this case was finished on May 25, 1937. Counsel for both sides were given time in which to file their printed briefs. One matter of legal importance has happened since the conclusion of the trial which this court should refer to in its opinion. On June 21, 1937, the United States Senate had under consideration an amendment to the Emergency Appropriation Act whereby federal emergency administration of public works was continued. On page 7894 of the Congressional Record class (e) of projects was being discussed, this class (e) being a classification under section 205 of the act (Joint Resolution No. 47, June 29, 1937 [Public Works Administration Extension Act of 1937] 15 U.S. C.A. note at end of c. 16). Here the sums of $16,650,000 as a grant and $14,850,000 as a loan were definitely earmarked for the Santee-Cooper project in South Carolina. It appears that on June 28, 1937, Congressional Record, page 8304, this allocation was agreed to by the Senate and has subsequently become the law.

This is of importance as showing that the funds were earmarked for the completion of this project. This has a bearing on the plaintiffs' contention of imminent danger. It also shows that the Congress has intention of completing this project.