15408

CREECH v. SOUTH CAROLINA PUBLIC SERVICE AUTHORITY *ET AL.*

(20 S. E. (2d), 645)

*Mr. Sheppard K. Nash* of Sumter, counsel for plaintiff,

*Mr. Christie Benet,* of Columbia, *Mr. W. M. Wilson* and *Mr. W. Turner Logan,* both of Charleston, and *Mr. Samuel Want* of Darlington, and *Mr. P. H. McEachin* of Florence, Counsel for defendants,

*Messrs. Watkins & Prince,* of Anderson, *Messrs. Robinson & Robinson,* of Columbia (with *Mr. Cordie Page,* of Conway, appearing as associated, in the report of the case by *Hon. J. B. Westbrook*), as counsel for Plaintiff-Inter-

venors, Lexington County et al., and Lyles Ford Tri-County Power Authority; (*R. Milo Smith,* of Lexington, *M. B. Holman,* of Batesburg, *W. D. Douglas,* of Winnsboro, *J. F. McClure* and *P. D. Barron,* both of Union, *David A. Gaston,* of Chester, *R. B. Hildebrand,* of York, *B. V. Chapman* and *R. A. Harley,* both of Newberry, *J. R. Folk,* of Edgefield, *Gregory & Gregory,* of Lancaster, and *Jos. L. Nettles, Jr.,* of Columbia, appearing as of counsel for Plaintiff-Intervenors),

Counsel for defendants, in a supplemental brief,

Counsel for plaintiff-intervenors, in a reply brief,

*Mr. Heyward Brockinton,* of Columbia, for defendant-intervenor, Richland County Rural Electric Cooperative, Incorporated, was permitted to adopt the return and answer filed by the South Carolina Public Service Authority.

May 12, 1942.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE FISHBURNE.

Authority was granted to institute this action in the original jurisdiction of the Supreme Court because of the public character and importance of the issues involved, and because of the apparent urgency that a definite and final ruling be made respecting the proposed undertakings and other threatened actions of the defendants.

The plaintiff, F. B. Creech, a citizen and resident of the State, owning real and personal property subject to taxation in the area embraced within the project popularly known as Santee-Cooper Project, brought this suit on behalf of himself and all others similarly situated, for an injunction restraining the South Carolina Public Service Authority and its Board of Directors from acquiring by purchase the property, plants, equipment, and facilities of the South Carolina Electric and Gas Company, largely located in Richland, Lexington, Fairfield, and Newberry Counties, and the property

and facilities of the Lexington Water Power Company, generally located in the above-named counties, as well as in the County of Saluda.

Under the order of this Court the right was accorded to all taxpayers and all other persons and corporations whose interests might be controlled or affected by the issues made in this cause, to intervene and plead in the action. Within the scope and under the sanction of this order, several school districts and counties in the State, geographically situated North of Richland County, and various persons and corporations have come into the cause as plaintiffs and have allied themselves with Mr. Creech, the original plaintiff, and joined with him in the prayer for injunction. By a later order, Richland County Rural Electric Cooperative, Incorporated, was permitted to intervene as a party defendant and to adopt the return and answer filed by the South Carolina Public Service Authority, which will hereafter be referred to as the Authority.

The Authority through the action of its Board of Directors has entered into negotiations for the acquisition by purchase of all of the properties of the South Carolina Electric and Gas Company and Lexington Water Power Company, and has agreed to pay for the said properties approximately forty million dollars. The electric properties which the Authority seeks to purchase are three hydro generating plants and one steam generating plant. The first hydro generating plant, operated by the South Carolina Electric and Gas Company, is located at Parr Shoals on Broad River, in Fairfield County, some thirty miles above the confluence of Broad and Saluda Rivers, with the dam extending across the river into Newberry County. The second hydro-electric generating plant is that of the Lexington Water Power Company on the Saluda River, about twelve miles above its confluence with the Broad River, with the dam and generating plant in Lexington County, and the reservoir (known as Lake Murray) extending into Newberry and Saluda Counties. The third property is the Co-

lumbia Canal hydro-electric generating plant, located on the Broad and Congaree Rivers at and just above the City of Columbia, with the diversion dam extending across Broad River to Lexington County just north of the junction of the two rivers.

As an integral and inseparable part of its negotiations for the purchase of the foregoing electric properties, the Authority also seeks to acquire from the Electric and Gas Company, located at Parr Shoals, a large steam generating plant, and its distribution system, which provides electric energy for the City of Columbia and Fort Jackson; also the gas manufacturing and distribution system of the Electric and Gas Company in Columbia, and its urban and suburban bus transportation system in Columbia, together with its gas manufacturing and distribution system in the Cities of Florence and Darlington.

The South Carolina Electric and Gas Company and the Lexington Water Power Company are subsidiaries of General Gas and Electric Corporation, which in turn is a subsidiary of the Associated Gas and Electric Corporation, a foreign corporation which is now being administered in bankruptcy under the laws of the United States.

At the present time the Authority is constructing a hydro-electric plant in the Santee Basin, at Pinopolis, consisting of four large and one small generating units. It is alleged that three of the large units have already been completed and are in operation. The Authority owns no steam plant or other reserve or stand-by production facilities.

The plaintiffs attack the legality of the proposed acquisition of the plants and facilities of the corporations referred to as *ultra vires* and in violation of the enabling Act which specially chartered and created the South Carolina Public Service Authority as a body corporate and politic (Acts 1934, No. 887, 38 Stat. at Large, 1507), and in violation of stated constitutional provisions.

Under the pleadings filed on behalf of the parties, the complaint, intervening petitions, answer, return and de-

murrer, various issues are presented for our determination, but we think the whole matter may be disposed of by answering the question, whether the Authority under the terms of the statute chartering it, construed and interpreted in the light of the whole Act, and considering the history of the legislation, has power to purchase completed and operating electric utility systems situated at and north of Columbia, and the gas and transportation business connected therewith.

We have held that the manufacture and sale of electric power is a governmental function, and, in the absence of a constitutional prohibition, the State may, through its agencies, engage in that business for the benefit of its people, and the Legislature may create agencies for that purpose. *Clarke v. South Carolina Public Service Authority,* 177 S. C., ·427, 181 S E., 481; 29 C. J. S., Electricity, § 6, page .493. In the foregoing case we dealt with several constitutional questions touching the validity of the enabling Act, and certain other issues then presented. The power of the Authority to undertake the purchase of completed and operating public utilities which is now claimed under the enabling Act was not then before us.

It will promote the solution of the problem now before us to first determine the corporate character of the Authority.

In our opinion, the South Carolina Public Service Authority is a public corporation in the nature of a *quasi*-municipal corporation, exercising certain governmental functions as an agency of the State. *Floyd v. Parker Water & Sewer Sub-District,* S. C., 17 S. E. (2d), 223. As such, the powers conferred are to be strictly construed, and any fair, substantial and reasonable doubt concerning the existence of any power or any ambiguity under the statute upon which the assertion of such power rests, is to be resolved against the corporation, and the power denied. *Luther v. Wheeler,* 73 S. C., 83, 52 S. E., 874, 4 L. R. A. (N. S.), 746, 6 Ann. Cas., 754.

Generally, a municipal corporation can exercise only those powers granted in express words or those necessarily or fairly implied in or incident to the powers expressly granted, or those essential to the declared objects and purposes of the corporation, which powers are not simply convenient, but indispensable. *Southern Fruit Co. v. Porter,* 188 S. C., 422, 199 S. E., 537.

In accordance with recognized rules of construction, the various provisions of an Act should be read so that all may, if possible, have their due and conjoint effect without repugnancy or inconsistency. The Court may not, in order to give effect to particular words, virtually destroy the meaning of the entire context; that is, give the particular words a significance which would be clearly repugnant to the statute, looked at as a whole, and destructive of its obvious intent. 25 R. C. L., 1008, § 247; *Crescent Mfg. Co. v. South Carolina Tax Commission,* 129 S. C., 480, 124 S. E., 761.

The legislative intention must be gathered from the language of the statute, not that found in any particular section or proviso, but from the statute as a whole, and it must be read in the light of all the circumstances, the situation and relation of the parties, the subject of the grant, and the purpose to be attained. *State v. Columbia Ry., Gas & Electric Co.,* 112 S. C., 528, 100 S. E., 355.

In construing charters to determine the powers of corporations, it is well settled, as in other cases of legislative grants, that they are to be construed strictly; any ambiguity in the terms of a corporate charter must operate against the corporation and in favor of the public. The specification of certain powers operates as a limitation on such objects only as are embodied therein and is an implied prohibition of the exercise of other and distinct powers. 13 Am. Jur., § 741, page 774.

Having in mind the purposes and subject-matter of the legislative grant of power, we turn to the provisions of the enabling Act.

The defendants point first to Section 3 of the enabling Act (Acts 1934, page 1507 *et seq.*) as one of the sources of their authority to consummate the contemplated purchase: "§ 3. Powers of the Authority.—The Public Service Authority shall have power to *develop* the Cooper River, the Santee River, and the Congaree River in this State, as instrumentalities of intrastate, interstate and foreign commerce and navigation; *to produce, distribute, and sell electric power*; to reclaim and drain swampy and flooded lands; and to reforest the water sheds of rivers in this State; and shall also have all powers which may be necessary or convenient for the exercise of such powers, including, without limiting the generality of the foregoing, the following powers: * * *." (Emphasis added.)

We see nothing in this general grant which in any way supports the contention that it empowers the Authority to carry into effect its contract for the purchase of the public utilities referred to. The purport of these provisions is governed and controlled by the word "develop," which in our opinion cannot logically include something which is already developed, completed and in operation. Nor can the word "produce," in the phrase, "produce, distribute and sell electric power," carry the meaning of purchase or acquisition by purchase. The word "Produce," Webster's New International Dictionary, means to bring forth, as a natural product or growth, to generate, yield, furnish. These definitions, which are the generally accepted ones, have no reasonable relation to the buying of electric utilities already producing electric power.

It is said that the following subdivisions of Section 3 grant the claimed power to buy or purchase the facilities in question:

"(4) To acquire, purchase, hold, use,. lease, mortgage, sell[,] transfer, and dispose of any property, real, personal or mixed, or any interest therein;

"(5) To build, construct, maintain and operate canals, dams, locks, aqueducts, reservoirs, draw-spans, ditches,

drains and roads, and to lay and construct any tunnels, penstocks, culverts, flumes, conduits, mains and other pipes necessary or useful in connection therewith;

\*     \*     \*

"(7) To build, acquire, construct, and maintain power houses and any and all structures, ways and means, necessary, useful or customarily used and employed in the manufacture, generation and distribution of water power, steam electric power, hydro-electric power and any and all other kinds of power, including power transmission lines, poles, telephone lines, substations, transformers, and generally all things used or useful in the manufacture, distribution, purchase and sale of power generated by water, steam or otherwise;

"(8) To manufacture, produce, generate, transmit, distribute and sell water power, steam electric power, hydro-electric power or mechanical power within and without the State of South Carolina;

\*     \*     \*

"(20) To do all acts and things necessary or convenient to carry out the powers granted to it by this Act or any other Acts;

"(21) To investigate, study and consider all undeveloped power sites and navigation projects in the State and to acquire and/or develop the same as need may arise in the same manner as herein provided;

"Provided always nevertheless; that said investigations, studies and considerations of said South Carolina Public Service Authority herein created shall be limited to the Congaree River and its tributaries below the confluence of the Board [Broad] and Saluda Rivers and the Wateree tributary of the Santee River at and near a point at or near Camden, South Carolina."

All of the foregoing sections, in accordance with accepted principles of interpretation, must be read together and considered as a whole. When the Au-

thority was given the power to *develop* the Cooper, the Santee, and the Congaree Rivers, it was charged with the duty to evolve latent possibilities and to make available resources hitherto undeveloped. This thought and this purpose is carried to a fuller expression in Subdivisions 4, 5, and 7 of Section 3. In Subsection 4, we find the words: "To acquire, purchase, hold * * * any property, real, personal or mixed, or any interest therein." In Subdivision 5, the power is granted to "build, construct, maintain and operate" the various instrumentalities and facilities necessary and useful in the generation of electric energy; and Subdivision 7 commences, "To build, acquire, construct and maintain power houses and any and all structures, ways and means," etc., employed in the generation and distribution of electric power, including power transmission lines, poles, telephone lines, substations, transformers, etc.

But nowhere in these subdivisions do we find any language upon which to hinge the vast powers now contended for by the Authority. It would have been a simple matter for the Legislature to have explicitly provided for the purchase of established, existing power plants and public utilities in the area claimed, but it has not done so. Can it be fairly said that the power to purchase real and personal property (Subdivision 4), and the power to build, acquire, construct and maintain power houses, etc. (Subdivision 7), also evince the clear legislative intent to authorize the purchase of already fully developed public utility businesses serving great areas of the State? We think not. The words in their natural context and in their relation to the whole Act are reasonably referable and conclusively so we think, to the power to develop and construct by bringing into being new facilities, rather than the power to buy or acquire great power plants long since engaged in the production of electric energy. It was never the intention of the Legislature, as we gather from the whole Act, that the Authority should be given the power to buy an existing utility system in order to produce, distribute and sell electric power.

The significance and meaning of the word "develop" is easily discernible in the structure of the entire statute.

Subdivisions 8 and 20 of Section 3 have no relation to the acquisition of electric utilities. They deal solely with the dominant purpose of the Act, that is, the development of the natural resources of the State.

Subdivision 21 of Section 3 delegates the power to acquire or develop *undeveloped* water sites and navigation projects in the State, and specifically limits the area within which this acquirement or development must be confined, that is "to the Congaree River and its tributaries below the confluence of the Broad and Saluda Rivers and the Wateree tributary of the Santee River at and near a point at or near Camden, South Carolina."

Throughout the enabling Act "The Santee-Cooper project" occurs by name time and time again. It is said that the fact that the enabling Act repeatedly mentioned "The Santee-Cooper project" by name, and also mentions "other power and/or navigation projects," clearly shows that the powers of the Authority are not limited to the Santee-Cooper project.

Section 5 of the Act has a direct application at this point. It provides: " * * * Forthwith upon the appointment and organization of the Public Service Authority it shall proceed with the improvement and development of the Cooper River, the Santee River, the Congaree River and their tributaries up-stream to the confluence of the Broad and Saluda Rivers and upstream on the Wateree River to a point at or near Camden for the aid and benefit of commerce and navigation, flood control and drainage, and for the development of the hydro-electric power inherent therein. The Authority shall investigate *other* power and/or navigation *projects* in the State and shall have power to *acquire* or *develop* desirable ones as early as practicable * * *." (Emphasis added.)

Then follows the limitation that nothing in the Act shall be construed to absorb or obstruct any applications now

pending before the Federal Emergency Adminstration of Public Works, and especially the proposed Greenwood County project on the Saluda River near Buzzards Roost.

It is argued that the Legislature clearly contemplated ■ that the grant of power to the Authority extended to the acquisition of power properties of the character and in the location now proposed to be purchased, and at other locations above Columbia. We think the manifest intention of Section 5, taken in connection with the entire Act, plainly confines and limits the Authority either to develop a power or navigation project, or else to acquire such a project already planned, but incomplete. It does not include an operating utility plant. The word "project" in these latter years of State and Federal construction of public works, has a well-known and generally recognized connotation which carries the meaning of a planned undertaking, a definitely formulated scheme or proposal. The project referred to in Section 5 might be merely in the blueprint stage, but it would do violence to Section 5, as well as to the whole tenor of the enabling Act to say that this section authorizes the purchase of old established utilities which had long been in the field of electric power production. The "project" referred to in this section clearly means new construction or new facilities in the development of natural resources.

It is conceded by the defendants that Subdivision 21 of Section 3, dealing with territorial areas, clearly takes away from the Authority the power to construct power and navigation projects at *undeveloped* sites above the confluence of Broad and Saluda Rivers, and above Camden on the Wateree River. But it is contended that this limitation relates only to "undeveloped power sites and navigation projects," and does not apply to the outright purchase of companies operating power plants already developed.

The whole legislative history of the enabling Act repels the conclusion that the proposed action of the Authority comes within the purview of the statute or was contemplated at the time of its passage as a legitimate exercise of corpor-

ate power. As already pointed out, the Authority is circumscribed in the range and scope of its operations and activities. It is confined within the compulsory limitations of the Act.

In Section 7 of the 1934 statute (the enabling Act), the design and purpose of the Legislature is declared. It is there said:

"Purpose of the Authority—Declaration of Public Interest .* * *.—The Public Service Authority is created *primarily* for the purpose of *developing* the Cooper River, the Santee River, the Congaree River and their tributaries upstream to the confluence of the Broad and Saluda Rivers and upstream on the Wateree River to a point at or near Camden *and other similar projects* as instrumentalities of intrastate, interstate and foreign commerce and navigation; of reclaiming waste lands by the elimination or control of flood waters, reforesting the watersheds of such rivers and improving public health conditions in those areas. It is hereby found and declared that the *project* authorized by this Act is for the aid of intrastate, interstate and foreign commerce and navigation, and that such aid and improvement of intrastate, interstate and foreign commerce and navigation *and the development*, sale and distribution of hydro-electric power is in all respects for the benefit of all the people of the State of South Carolina * * *." (Emphasis added.)

Nor can we find any support for the construction sought to be given this statute by the defendants by reason of the fact that the enabling Act provides that the office of the Authority is to be located in the City of Columbia, with branch offices located at such other points as the Authority may desire. Nor does it aid their construction that the Act provides that one member or director of the Santee-Cooper Authority shall be appointed from each congressional district. It is suggested that by reason of these provisions the intent of the Legislature may be gathered, at least by implication, that

the Authority could purchase established plants such as the plants in question. We do not think the suggested implication follows. These considerations and implications are not proper substitutes for an express grant of power.

The intention is easily discovered from the Act that the power generated by the Pinopolis Dam would be sold not only in the lower part of the State, but throughout its length and breadth. Hence, the very reasonable provision for having directors from different sections of the State, and the authority to establish branch offices.

In support of the construction we place upon the enabling Act, it is not amiss to point out that in the years 1941 and 1942 the Legislature had before it bills for the amendment of the charter of the Authority. These proposed amendments sought to confer upon the Authority power to do the very things which it now seeks to do. In each instance the bill failed of passage. These bills included in their provisions specific authorization on the part of the Authority to acquire by purchase the electric properties and facilities of the South Carolina Electric and Gas Company and Lexington Water Power Company, including "gas manufacturing plants and distribution mains and systems and urban and suburban transportation utilities or systems, and other properties and businesses of a public utility character operated in connection therewith * * *." And this proposed grant of power was sought to be given "notwithstanding anything to the contrary contained in any other section of this Act (1934 enabling Act)."

Nowhere in the enabling Act is authority conferred upon the defendants to engage in the production and sale of gas and to own a bus line and operate a system of transportation in the City of Columbia. These properties are valued at over two million dollars, but the defendants argue that their inclusion in the proposed purchase is merely temporary or incidental, and represents no substantial part of the regular permanent business of the utility companies in question. We are unable to share this view. In

the first place the production, distribution and sale of gas in the cities of Columbia, Florence and Darlington and the furnishing of bus transportation to the large and expanding City of Columbia and nearby Fort Jackson, cannot reasonably be regarded incidental to the business carried on by the Gas and Electric Company. In the second place, the charter of a corporation is a measure of its powers; and an enumeration of these powers implies an exclusion of all others. The power to purchase gas plants and to buy and operate a large bus transportation business is not bestowed by the statute, and is contrary to its general purpose, which is the development and conservation of the natural resources of the State within territorial limits.

Only such powers as are reasonably necessary to enable corporations to carry out the express powers granted and the purposes of their creation are to be implied or are to be deemed to be incidental. Accordingly, an incidental power may be defined to be one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has merely some slight or remote relation to it. Powers merely convenient or useful are not implied if they are not essential, having in view the nature and object of the incorporation. 13 Am. Jur., § 740, page 773.

It is perhaps unnecessary to say that Courts have no legislative powers, and in the interpretation and construction of statutes their sole function is to determine, and within the constitutional limits of the legislative power to give effect to, the intention of the Legislature. They cannot read into a statute something that is not within the manifest intention of the Legislature as gathered from the statute itself. To depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret. The responsibility for the justice or wisdom of legislation rests with the Legislature, and it is the province of the Courts to construe, not to make, the laws. There is a marked distinction between liberal construction of statutes, by which

Courts, from the language used, the subject-matter, and the purposes of those framing them, find out their true meaning, and the act of a Court in ingrafting upon a law something that has been omitted, which the Court believes ought to have been embraced. The former is a legitimate and recognized rule of construction, while the latter is judicial legislation, forbidden by the constitutional provisions distributing the powers of government among three departments, the legislative, the executive, and the judicial.

Other interesting questions are presented by the pleadings, and are ably and exhaustively covered in the briefs of counsel, but they become academic in view of our holding that the enabling Act does not authorize the purchase of the properties in question.

Our conclusion is that the South Carolina Public Service Authority is not empowered under the enabling Act of 1934 to purchase or acquire the plants and facilities of the South Carolina Electric and Gas Company and Lexington Water Power Company.

As prayed for in the complaint, a permanent injunction will issue.

MESSRS. ASSOCIATE JUSTICES BAKER and STUKES, and CIRCUIT JUDGE L. D. LIDE, ACTING ASSOCIATE JUSTICE, concur.

MR. CHIEF JUSTICE BONHAM (Dissenting).

I cannot concur in the disposition which MR. JUSTICE FISHBURNE has made of the crucial question involved in this case, to wit: Whether the South Carolina Public Service Authority, under the terms of the statute chartering it, has the power to purchase completed and operating electric utility systems situated at and north of Columbia, and the gas and the bus transportation businesses connected therewith.

The necessary facts, the history of the litigation and the issues to be determined have all been carefully and correctly set forth and discussed in the able opinion which MR. JUSTICE FISHBURNE has prepared, and need not be repeated here.

It is only the conclusions of law as expounded in the majority opinion to which I must dissent.

The question, as stated above, obviously involves two issues, the first of which challenges the power of the Authority to purchase completed and operating electric utility systems situated at and north of ·Columbia.

Section 3, of the Act of 1934, No. 887, page 1507, contains the following provision:

"The Public Service Authority shall have power * * *; to produce, distribute and sell electric power; * * * and shall also have all powers which may be necessary or convenient for the exercise of such powers, * * *."

Thus it will be seen that one of the important functions of the Authority, and one of its reasons for being brought into existence, was to produce, distribute and sell electric power. In the case of *Clarke v. South Carolina Public Service Authority et al.,* 177 S. C., 427, 181 S. E., 481, this Court held that the General Assembly of this State had the right to bring the Authority into being to engage in the business of hydro-electric power, and that the manufacture and sale of power is a public and governmental function. In furtherance of this proper function, the General Assembly therefore gave to the Authority "all powers which may be necessary or convenient for the exercise" of the powers which, in part, have been stated above.

Following the above broad statement of powers of the Authority, the language of Section 3 contains the following specific ones:

"(4) To acquire, purchase, hold, use, lease, mortgage, sell, transfer, and dispose of any property, real, personal or mixed, or any interest therein;

"(7) To build, acquire, construct and maintain power houses and any and all structures, ways and means, necessary, useful or customarily used and employed in the manufacture, generation and distribution of water power, steam electric power, hydro-electric power *and any and all other kinds of power,* * . * * *and generally all things used or useful in*

*the manufacture, distribution, purchase and sale of power generated by water, steam or otherwise;* [Emphasis added]

"(8) To manufacture, produce, generate, transmit, distribute and sell water power, steam electric power, hydroelectric power or mechanical power *within and without the State of South Carolina;* [Emphasis added]

"(20) To do all acts and things necessary or convenient to carry out the powers granted to it by this Act or any other Acts."

The powers which have been named are broad. Indeed, the undertakings with which the Authority is charged could scarcely be entered upon at all without broad powers. The production, distribution and sale of electric power, the development of the Cooper, Santee, and Congaree Rivers, as instrumentalities of intrastate, interstate and foreign commerce and navigation, the reclaiming and drainage of swampy and flooded lands, the reforestation of water sheds "of rivers in this State", all of which are authorized by Section 3 of the Act, are undertakings of such considerable scope that they could scarcely be begun, and certainly could not be consummated, without the extensive powers with which the Authority was vested by the enabling Act.

In considering completed and operating electric utility systems, it will be observed that the foregoing powers are not limited by territorial boundaries. For example, subsection 4 of Section 3, which is quoted above, sets no limits upon the area in which the Authority may acquire, purchase, hold, use, sell, transfer or dispose of "any property, real, personal or mixed; or any interest therein"; nor does subsection 7, *supra,* set any territorial bounds upon the right of the Authority to acquire and maintain power houses and any and all structures, ways and means necessary, useful or customarily used and employed in the manufacture, generation and distribution of water power and any and all other kinds of power. Had any territorial limitation been intended, it seems clear to me that such restrictions

would have been set forth in connection with the listing of the powers which were conferred.

In addition to the foregoing powers, the Act proceeds, in subsection 21 of Section 3, to confer upon the Authority the further power:

"To investigate, study and consider all undeveloped power sites and navigation projects in the State and to acquire and/or develop the same as need may arise in the same manner as herein provided;

"*Provided* always nevertheless; that said investigations, studies and considerations of said South Carolina Public Service Authority herein created shall be limited to the Congaree River and its tributaries below the confluence of the Board [doubtless meaning Broad] and Saluda Rivers and the Wateree tributary of the Santee River at and near a point at or near Camden, South Carolina."

With reference to the completed and operating electric utility systems with which we are now conserned, the conclusion seems inescapable to me, in the light of the whole Act, as well as in the light of the provisions of Section 3, that the enabling Act places no limitations upon the area in which the Authority is empowered to produce, distribute and sell electric power; and it seems abundantly evident that no territorial limitation is intended with respect to the location of "any property, real, personal or mixed, or any interest therein" which may be acquired, purchased, held, used and disposed of for the purposes named in the Act.

The present case involves the proposed purchase, by the Authority, of three hydro-generating plants and one steam generating plant, together with certain other completed and operating properties, all of which are clearly described, and their locations given, in the main opinion, and need not be further identified here.

It seems evident to me that none of the properties involved in this action could conceivably be classified as "undeveloped power sites and navigation projects" upon which

a territorial limitation is placed by subsection 21 of Section 3; and it seems an equally inescapable conclusion that subsection 21 applies solely and exclusively to undeveloped power sites and navigation projects. Indeed, subsection 8 specifically empowers the Authority to manufacture, produce, generate, transmit, distribute and sell water power, steam-electric power and hydro-electric power "within and without the State of South Carolina." Therefore subsection 21 of section 3 impresses me as being a restricted power, given in addition to the fuller powers which had previously been named. In 59 C. J., 974, Section 575 (e), it is stated:

"* * * Where the statute establishes a general rule and certain exceptions thereto, the Court will not, by implication, add any more exceptions, and will not add exceptions merely because good reasons exist for adding them."

In construing this statute as a whole, upon which strong emphasis is placed in the majority opinion, we must not lose sight of the dictum of this Court with reference to the construction of statutes, as stated in the case of *Home Building & Loan Association v. City of Spartanburg et al.,* 185 S. C., 313, at page 321, 194 S. E., 139, at page 142, in which it was said:

" * * * Full effect must be given to *each section,* and the words must be given their plain meaning. * * *" (Emphasis added.)

In giving full meaning to Section 3, of the act, how can this statute, which empowers the authority to acquire real or personal property, to produce and distribute electric power, within and without this State, and to exercise all powers necessary or convenient for the exercise of such powers, be said to define any particular area in which such powers are to be used, except insofar as such powers are expressly limited therein?

It should also be borne in mind that the South Carolina Public Service Authority is a public body, created and functioning for the express purpose of benefiting all of the people of South Carolina. Therefore, the powers conferred

by Section 3 should be construed liberally in order to give effect to the purpose of the Act. As was stated by this Court in case of *Leitzey v. Columbia Water-Power Company*, 47 S. C., 464, 479, 25 S. E., 744, 749; 34 L. R. A., 215: "* * * 'The principle of strict construction is less applicable where the powers are conferred on public bodies for essentially public purposes.' * * * 'The right to condemn will be more readily inferred in favor of public corporations exercising powers solely for the public benefit than in favor of private individuals, or corporations organized for pecuniary profit.' * * * "

And in 43 C. J., 197, Section 193 (b), it is stated:

"Within the limits of their powers municipal corporations are favored by the courts; in such cases, rules of strict construction do not apply; * * *. The possession of the power being established, a generous measure of its exercise will be permitted to the end that it may effectuate its purpose.

"The rule of strict construction does not apply to the mode adopted by the corporation to carry into effect powers expressly or plainly granted. In determining whether or not it is properly exercising a granted power, the presumption is in favor of the corporation, * * *."

Since the territorial inhibitions in the act specify only undeveloped power sites and navigation projects, neither of which is involved in the present case, I cannot see how the General Assembly contemplated any restriction upon the acquisition by the Authority of the developed and operating properties now under consideration.

On the second issue involved in the controlling question as stated by Mr. Justice Fishburne, I must also dissent. The record reveals that one of the companies whose properties are sought to be purchased *in toto* by the Authority is the South Carolina Electric and Gas Company, which owns and operates, besides the distribution system of its power plant, a gas manufacturing and distribution system in the cities of Florence and Darlington, a gas manufacturing and distribution system in the city of Columbia, and a bus

transportation system serving the public of that city as well as points sòme distance away. This issue pertains to the power of the Authority to purchase the foregoing properties as an integral and inseparable part of its negotiations with the South Carolina Electric and Gas Company.

The last paragraph of Section 3, of the Act provides that: "* * * the Board of Directors may sell any surplus property . which it may acquire and which said Board of Directors shall deem not to be necessary for the purpose of the development."

In my opinion, the General Assembly thus specifically clothed the Authority, through its Board of Directors, with the right, as an incident to the purchase of properties within the primary scope of its public functions, to purchase other properties from the same parties. Such other properties might be secondary to the objects for which the Authority was created, or they might even be unrelated to its purposes. In any event, the Act clearly recognizes that the Board of Directors may acquire and sell surplus property.

The defendants, in their printed brief, have aptly drawn an analogy in this respect between the Authority and an educational institution empowered to acquire property for purposes which lie entirely within the sphere of education. Certainly the acquisition of a tract of land for educational purposes should not rightfully be restrained merely because there was a building on the land devoted to a comparatively small noneducational business enterprise.

Very frequently it occurs that one cannot purchase something which he requires without the necessity of purchasing, at the same time, something for which he has no need. A cotton grower, for instance, might find difficulty in purchasing only the fertile acres of a farm, omitting the pasture lands, and a prospective purchaser of a home would often be unable to persuade the seller to exclude the land at the rear of the lot merely because there was more space in the back yard than he required.

Accordingly, the General Assembly doubtless recognized the possibility that the Authority would acquire property which would not be within the scope of the purposes for which it was created. In the acquisition of properties which are necessary to the fulfillment of its proper function, it is hardly possible that it could always negotiate a purchase without occasionally having to purchase other property which it lacks the power to develop and utilize. Such surplus property, when so acquired, is a normal incident to the lawful purposes of the Authority. The power of a public body, designed for the good of all the people of the State, to engage in a specified activity, could be defeated by imposing a prohibition against its acquiring surplus property which could conceivably be one of the conditions involved in acquiring other property necessary for its legitimate use. Such a prohibition was not contained in the Act.

It is evident from the Act, considered both as a whole and as the sum of its parts, that the General Assembly conferred no right upon the Authority to operate a bus transportation system, a gas plant or a gas distribution system. Such undertakings are extraneous and foreign to the purposes of the Act, and such properties when purchased become surplus property, within the meaning of the Act, and although they cannot be operated, they can be acquired and sold.

In my opinion, a permanent injunction should be denied.