[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 195 
August 1, 1949.
This action was commenced by the named power companies as plaintiffs against South Carolina Public Service *Page 199 
Authority, defendant, in the Court of Common Pleas for Berkeley County on February 15, 1949. Demurrer to the complaint was overruled by order dated April 18, 1949, and this appeal followed. It is necessary to rather fully state the material allegations of the complaint which will be done in succeeding paragraphs.
The companies are South Carolina corporations except Carolina Power Light Company, which is incorporated under the laws of North Carolina. All are electric utility corporations and are lawfully engaged in business in this State. They own large amounts of real and personal property and pay very substantial taxes to the State and its subdivisions. The defendant is a State-owned corporation, created and operating pursuant to the statute which, as amended, constitutes sections 8555-11 to 8555-28 of the Code of 1942, originally enacted in 1934, 38 Stat. 1507. It is the contention of the complaint that the Authority is an "electrical utility" as defined in the Act of 1932, 37 Stat. 1497, now codified as Secs. 8555-1 to 8555-8 of the Code, and subject to the terms of that law and thereby subjected to the jurisdiction of the Public Service Commission except as to the express exemptions contained in its enabling act which include only construction of its generating plant and the fixing of its rates.
Central Electric Power Cooperative, Inc., is a cooperative membership corporation, formed under the Rural Electric Cooperative Act of 1939 (now Sections 8555-91 to 8555-123 of the Code) for the purpose of supplying, etc., electricity in rural areas and exempt from all control of the Public Service Commission. Central Electric is nominally sponsored by fourteen cooperative membership corporations which have distribution systems, financed by the Rural Electrification Administration of the United States, in sections of the State in which the plaintiff power companies are also engaged in business. It was formed to borrow funds from the federal Rural Electrification Administration for the cost of construction *Page 200 
of a transmission system for operation and ultimate ownership by the defendant.
Plaintiffs have operated in their respective territories since prior to 1932 and maintain transmission and distribution lines and other equipment necessary to render service in every way and have an ample supply of electricity to meet all demands, and have planned in advance to meet future demands, whereby they have acquired the right under Code Sec. 8555-2 (23) to be free from competition in their respective territories.
Plaintiffs unsuccessfully undertook to enjoin the construction and operation of the defendant. Carolina Power Light Co. v. S.C. Public Service Authority, D.C.,20 F. Supp. 854; 4 Cir., 94 F.2d 520. They have recently offered to purchase the surplus energy of the defendant and are now purchasing specified quantities of it which is, and will be, available to rural cooperatives, but the defendant has refused to accept the offer or to negotiate.
The proposed transmission system, the cost of which will be met by a loan from the Rural Electrification Administration to Central Electric Power Cooperative, Inc., will deliver energy from defendant's generating plant to the fourteen cooperative membership corporations in twenty-seven counties of the State which lie wholly within the service areas of the plaintiffs, and the defendant and Central Electric have contracted that the defendant will maintain and operate the system and make the annual payments required to service and amortize the construction loan over a period of thirty-five years, whereupon title to the transmission system will vest in defendant. The purpose of the defendant, as alleged in the complaint, is to use the completed transmission system to unlawfully compete with the plaintiffs, injure and finally destroy them, whereby industrial development of the areas will be adversely affected.
It is further alleged that the construction loan is in violation of the Federal law, 7 U.S.C.A. § 904, and of the State *Page 201 
law relating to rural electric cooperatives, Code § 8555-93 (d); and the undertakings of the defendant are ultra vires and illegal because they will (a0 duplicate existing transmission lines of the plaintiffs without certificate therefor from the Public Service Commission pursuant to Code § 8555-2 (23), (b) go beyond its geographical limits, result in the acquisition of a completed and operating transmission system, and compete with private utilities in their service areas, (c) violate the provisions of the enabling act which relate to the finances of defendant, (d) acquisition of the proposed transmission lines is not necessary or useful to performance of defendant's statutory functions and (e) the plan will include a guaranty of the obligations of another corporation, in violation of the enabling act.
Plaintiffs allege that this action in equity is brought in their own right to establish and protect their property rights and the privilege to furnish electric service in their respective areas free from the illegal and destructive competition of defendant; and as taxpayers, for the benefit of themselves, and others, to enjoin defendant from intended violations and evasion of the State and Federal statutes; and finally, to invoke the power of the court to enter a declaratory judgment with respect to the rights of plaintiffs and defendant, pursuant to Act No. 815 of 1948, 45 Stat. 2014. It is alleged that plaintiffs cannot successfully compete with defendant as to rates because the latter's generating plant was largely constructed with Federal grants and loans at low interest rates, and it is relieved of State and Federal taxes which plaintiffs have to pay; and the result will be disastrous to the industrial; development of the territory involved for inability of plaintiffs, with this handicap, to expand their facilities to meet increased demand and defendant will have an insufficient supply of energy.
The prayer of the complaint is for relief by way of judgment declaring that plaintiffs have to right to freedom in their areas from competition by defendant, that the latter is subject to the jurisdiction of the Public Service Commission *Page 202 
except as to the construction of its generating plant and the fixing of its rates, that the construction, operation and acquisition of the proposed transmission system are ultravires acts of the defendant and in violation of State and Federal laws; and that the defendant be enjoined from performance of the contract between it and Central Electric, and from constructing or acquiring the contemplated transmission system, and from generating, transmitting, delivering or selling energy in the territory served by the plaintiffs and from otherwise competing therein.
The demurrer was upon the grounds (1) that the complaint shows that the court is without jurisdiction because (a) the Rural Electrification Administration of the United States and the Administrator thereof are necessary parties and they have not consented to be sued and the allegations of the complaint are insufficient to constitute a justiciable controversy because the acts of the defendant sought to be enjoined are authorized by law and within its discretion; and (2) that it appears that the plaintiffs are without capacity to sue as utilities or taxpayers; and (3) that the complaint does not state facts sufficient to constitute a cause of action because of the points made in (1) above.
The order under appeal overruled the grounds of the demurrer relating to defect of parties, to the jurisdiction of the court and the capacity of plaintiffs to sue which left for consideration the general ground that the complaint fails to state facts sufficient to constitute a cause of action. This was also overruled by the trial court, quoting, "for the sole reason * * * that the complaint does set forth a good cause of action to ask the court for a declaratory judgment."
The defendant took twenty-one exceptions which have been presented in briefer form, as will be seen. Respondents submit additional grounds to sustain the order to the effect that the allegations of the complaint entitle them, in their own right, to injunction against the competition threatened by the appellant, and also entitle them as taxpayers to injunction *Page 203 
against the alleged ultra vires acts committed and threatened by appellant.
Appellant has stated the questions involved in the appeal, as follows:
I. Does the complaint, as an equitable action for an injunction, state facts sufficient to constitute a cause of action?
II. Did the Circuit Judge err in entertaining the action as one for a declaratory judgment, and in overruling the demurrer on the merits for the sole reason that the complaint states a cause of action to ask the Court for such a judgment?
III. Can the relief sought by the respondents be granted in the absence as a party of the Rural Electrification Administration of the United States, and the Administrator thereof?
Respondents made no counter-statement of issues and in their brief argued the stated questions in the above sequence and appropriately included their sustaining grounds in that numbered I, which we shall first decide.
There is a background of litigation between the parties. See the opinion in the consolidation of actions cited in the complaint and reported under the title of Carolina Power Light Co. v. S.C. Public Service Authority, D.C.,20 F. Supp. 854, affirmed by the Circuit Court of Appeals, 4 Cir., 94 F.2d 520, certiorari denied, 304 U.S. 578,58 S.Ct. 1048, 82 L.Ed. 1541. It was there very clearly held that the competition of the present appellant affords no ground for legal objection by respondents. The late, lamented Judge J. Lyles Glenn tried the case and his comprehensive judgment was sustained and characterized by the Court of Appeals as able and exhaustive. He found and frankly said that there was no escape from the conclusion that the competition of the Authority will practically destroy the present respondent South Carolina Power Co.; will seriously injure the respondent now known as South Carolina Electric 
Gas Co.; and will injuriously affect to a large degree the business of the respondent Carolina Power Light Co. *Page 204 
The ratio decidendi of the decision against the present respondents was that the competition and impending damage are not illegal. There is no need to repeat here the citations of the precedents upon which the conclusion was reached. Worth repeating are the words of trial Judge Glenn, as follows: "Investors who have in the meantime, put large sums of money into privately owned properties may lose, and we may regret the loss, but they were at all times charged with the knowledge that there might come such a change in the general method of operating electric power plants." [20 F. Supp. 866.] The same thought was expressed by the court in the leading case of Alabama Power Co. v. Ickes,302 U.S. 464, 58 S.Ct. 300, 304, 82 L.Ed. 374, as follows: "The claim that petitioner will be injured, perhaps ruined, by the competition of the municipalities * * * presents a clear case of damnum absque injuria." The point is that respondents have no exclusive franchises for the distribution and sale of power in their respective areas of operation. This was clearly stated by the Circuit Court of Appeals in the former litigation referred to, Carolina Power Light Co. v.S.C. Public Service Authority, supra, 94 F.2d at page 523, as follows:
"It is admitted that none of the plaintiffs has a franchise which is exclusive as against the Authority, * * * The only interest which plaintiffs claim to have in the matter is that they will be damaged by reason of the fact that the defendant Authority will sell electric current in competition with them and that the construction of the project will enable it to produce the current. As plaintiffs have no exclusive franchise for the sale of electric current, however, no right of theirs will be invaded by competition on the part of the Authority or by any sales which it may make."
The gravamen of that Federal Court attack upon appellant by respondents was that competition by appellant would injure them. That is at least to some degree inconsistent with the position now taken by respondents, that appellant is not authorized by law to furnish the competition described *Page 205 
in the complaint and, in any event, that respondents are shielded from such competition by the discretionary powers of the Public Service Commission. If the latter were true, respondents were mistaken in the premise of their position in the former litigation. If they were protected from competition by the jurisdiction of the Commission they had no reason to try to have it enjoined as unlawful. Yet that was their position then.
The rule of the cited Federal decision had already been established in this court.
Action was brought in our original jurisdiction in 1935 in which the constitutionality of appellant's enabling act was unsuccessfully attacked on many grounds, Clarke v. S.C.Public Service Authority, 177 S.C. 427, 181 S.E. 481,485. Two of the questions decided were stated in the briefs and reproduced in the opinion, as follows:
"V. Did the General Assembly have power to create an agency to engage in the power business?
"VIII. Does Act 887 (the enabling act) violate the Constitution by confiscating business of individuals or corporations?"
The questions were fully discussed, especially VIII, and many authorities were cited from this and other courts to demonstrate the unsoundness of the attack embodied in the questions. It was said in effect that the reason for the conclusion is that the State may engage in the public business of the generation, distribution and sale of electric power regardless of the effect upon private utilities because the welfare of the State and its people is paramount. When the rights and interests of the public as a whole and its private citizens or its corporations conflict, the rights and interests of the latter must yield to the rights and interests of the public; and competition may be restrained by the courts only when it is unlawful competition which this is not, even if it results in practical confiscation of the business and property of private corporations and individuals. *Page 206 
Respondents mainly rely in the instant case upon the proposition that appellant is about to engage in the sale and distribution of electric current in their territories without obtaining from the State Public Service Commission a certificate of convenience and necessity pursuant to the requirement of subdivision 23 of Section 8555-2 of the Code of 1942 which applies to any "electrical utility". This statutory provision was originally subsection (w) of Section 2 of the Act of 1932, 37 Stat. 1497, which was entitled, "An Act regulating persons, corporations and municipalities engaged in the generation, transmission, delivery or furnishing of electricity," etc. Two years later, in 1934, the act was passed, 38 Stat. 1507, entitled, "An Act to incorporate the South Carolina Public Service Authority and to define its powers and duties." It is now codified as Chapter 163-B of the Civil Code and embrace Sections 8555-11 to 8555-28, inclusive. The Authority is governed by a board of directors appointed by the governor, one from each congressional district of the State, and a chairman from the State at large, which executes its powers; and an advisory board which is composed of constitutional officers of the State, ex officio. Express powers include, Section 8555-13, the production, distribution and sale of electric power; subsection (7), to acquire, construct and maintain power transmission lines, etc., and, quoting, "all things used or useful in the manufacture, distribution, purchase and sale of power * * *"; (8), to "manufacture, produce, generate, transmit, distribute and sell * * * power, within and without the State of South Carolina." Reference to the statutes will disclose the delineation of other powers which, in view of the foregoing, need not be enumerated except that in subsection (13) which is to fix its own rates for the sale of its products and services, and subsection (14), to borrow funds and issue securities, etc.
Respondents candidly say in their printed brief, as follows:
"Respondents also conceded below and concede here that the Authority's enabling act gave it such express, specific and *Page 207 
detailed permission to fix and determine its own rates and issue securities as to except it from Commission jurisdiction in these two respects."
How can it be said that the expressed authorizations mentioned are effective to exempt appellants from jurisdiction of the Commission in those respects and that similar expressed power to build and maintain transmission lines does not have the same effect? We do not think that it logically can. Consideration of the elaborate terms of the law discloses no ground for the attempted distinction upon which respondents depend.
No mention is made in this extensive legislation, which created the appellant and defined its duties and powers, of the Public Service Commission which only two years before had been charged anew with the regulation of electrical utilities. It cannot be reasonably concluded that the legislature intended that appellant should be under the jurisdiction and control in any manner of the Public Service Commission, unmentioned in the Act creating the appellant, and the latter expressly given the right to fix its own rates, authorize its own indebtedness, etc., all important functions of the Public Service Commission with respect to privately owned electrical utilities. The Act of 1932, Code Secs. 8555-1et seq., expressly excludes from its application municipally owned utilities as to their activities, rates, etc., within the respective municipalities operating them, which plainly shows the intention of the legislature in 1932 not to subject municipal plants within the municipalities to the regulation of the Public Service Commission. Can it be logically said that the legislature had a contrary, unexpressed intention in 1934 to so subject the large newly created State-owned utility, which is the appellant? We do not think so, especially in view of the expressed powers to appellant to generate, distribute and sell electricity at its own rates, issue securities, etc. *Page 208 
The validity of the enabling Act of 1934 was challenged, as said above, in the action of Clarke v. S.C. Public ServiceAuthority, supra, 177 S.C. 427, 181 S.E. 481, 488, and this court there said, consonant with the present pronouncement, the following:
"It is also contended by the plaintiff that the public service commission is intrusted with the exclusive power to regulate utilities in South Carolina, and that the Act is unconstitutional in permitting the Authority to fix its rates. We do not think this position is tenable, for the reason that the public service commission was intrusted with the supervision of utilities by statute and not by the Constitution, and the Authority was granted permission to fix its rates by a statute which was enacted subsequent to the Act allowing the public service commission to fix rates for utilities. It might also be observed that in the Utilities Act (37 Stats. at Large, page 1497, and as amended by 38 Stats. at Large, at page 1452), the rates charged by municipalities were specifically exempted from the supervision of the public service commission."
Appellant's enabling act is itself license from the State to do the things specified in the act and it would be quite illogical to hold that it must nevertheless go to another State agency for permission, in the absence of express legislation requiring it. As Judge Glenn remarked in the opinion inCarolina Power Light Co. v. S.C. Public Service Authority,supra, 20 F. Supp. at page 863, "We are not dealing here with a certificate of public convenience and necessity issued by an administrative body; we are dealing with a statute passed directly by the Legislature and authorizing this specific project. It is well understood by every student of government that such a statute is the highest kind of certificate of public convenience and necessity."
There is a rule of statutory construction which affords further reason why the subsequent enabling act of the Authority obviates the necessity of procurement by it of a certificate from the Public Service Commission to *Page 209 
extend its transmission lines. The prior Act of 1932 relating to the powers and jurisdiction of the Commission is a general act and applicable to all privately owned utilities and to those municipally owned to the extent of the latters' operations beyond their respective municipal limits. The enabling act of the Authority is special in its nature and refers only to the creation, operation and functions of the Authority. If there be conflict between a general law and a special law on the same subject, the latter will prevail. Truesdell v. Johnson,144 S.C. 188, 142 S.E. 343; State ex rel. South CarolinaTax Commission v. Brown, 154 S.C. 55, 151 S.E. 218;Spartanburg County v. Pace, 204 S.C. 322,29 S.E.2d 333. This rule is close akin to another which is to the effect that an inconsistent statute dealing with common subject matter in a minute way will prevail over a general statute relating to the same subject matter. Smith v. South CarolinaHighway Com., 138 S.C. 374, 136 S.E. 487; State ex rel.South Carolina Tax Commission v. Brown, supra, 154 S.C. 55,151 S.E. 218; Murray v. W.O.W., 192 S.C. 101,5 S.E.2d 560. Application of these rules to the statutes under review induce the conclusion that appellant is not subject in the exercise of its statutory powers to the certificate section of the Act of 1932 and is not relegated to the Public Service Commission for leave to proceed in the execution of the powers given in its enabling act. These rules of construction which have been arrived at over the years are helpful aids in reaching the judicial goal of determination of the legislative intention. Another pertinent one which should not be overlooked is that in case of conflict, the last legislative expression ordinarily governs.
We repeat the general consideration first adverted to hereinabove which well might be deemed to be sufficient in itself to show that it was not the intention of the General Assembly that appellant should have to apply under an antecedent law to the Commission for a certificate of convenience and necessity to procure the construction of the transmission lines in question, which is that it is uncontroverted that the enabling *Page 210 
act authorized appellant to construct its generating plant, sell its product and independently fix its rates, all without reference to the Commission. It is almost inconceivable that it was nevertheless the legislative intent that appellant should have to seek the permission of the Commission, another creature of the legislature, to construct and maintain transmission lines wherever necessary for the delivery of the power which it generates and has for sale. We conclude to the contrary. However, before leaving the subject we shall briefly refer to several additional arguments of respondents.
First, they say that under the charters of some or all of them they are empowered to sell electricity anywhere in the State. Nevertheless they concede that with reference to the extension of their lines they are subject to the jurisdiction of the Commission and to the certificate section of the law which has been discussed and that therefore appellant, as a competing utility, is similarly subject to it. This is a non sequitur. The answer is that all privately owned utilities are subject to the regulatory Act of 1932 but we have found that the legislature intended by passage of the subsequent enabling act of appellant to exclude it from the jurisdiction of the Commission. Respondents admit such legislative power and we find that it was exercised to the end that the publicly owned appellant is free of that regulation.
Secondly, it is argued that subdivision 7 of section 8555-13 of the Code (part of the original enabling act of 1934) limits appellant's power to acquire, construct and maintain transmission lines. The generality of these provisions does not admit of its construction as a limitation as urged by respondents. It is here quoted: "(7) To build, acquire, construct and maintain power houses and any and all structures, ways and means, necessary, useful or customarily used and employed in the manufacture, generation and distribution of water power, steam electric power, hydro-electric power and any and all other kinds of power, including power transmission lines, poles, telephone lines, substations, transformers, *Page 211 
and generally all things used or useful in the manufacture, distribution, purchase and sale of power generated by water, steam or otherwise."
Some other States by appropriate legislation subject publicly owned electrical utilities within their boundaries to the jurisdiction of their regulatory bodies which correspond to our Public Service Commission and there are persuasive points for that policy, but it is policy and cannot properly affect the judicial construction of our statutes. Respondents' brief contains strong arguments in behalf of the wisdom of such regulation but they should be directed to the legislature and have no place in our consideration of the applicable statutes.
So much for the question of claimed jurisdiction of the Public Service Commission over the transactions alleged in the complaint. We find that the alleged jurisdiction does not exist. Our opinion thereabouts renders unnecessary separate consideration of respondents' conclusions which are stated in the complaint, summarized above, that the proposed loan by the federal Rural Electrification Administration is beyond its statutory powers and that the intended transactions of Central Electric and its constituents will violate the State Rural Electrification law. The stated conclusions are not argued in the brief and, in fact, it is frankly conceded that, so far as maintainable, they depend upon jurisdiction of the Public Service Commission which we have found to be non-existent. We turn now to the other points of attack which are argued in the brief.
First under this heading is the claim that the proposed transaction alleged in the complaint is ultravires with respect to appellant. It is said that the result of the agreement will be dissipation of appellant's earnings and will be contrary to the prudent operation and conduct of its business. Reference is had to Code Sec. 8555-19 which provides that net earnings not necessary or desirable for the prudent conduct and operation of its business and *Page 212 
the payment of its evidences of indebtedness or other obligations shall be paid to the State for the reduction of the tax burden. It has been pointed out that the management of appellant has been entrusted by the law to a state-wide board of directors, appointed by the governor, with an advisory board composed of constitutional officers, ex officio, who are elected to their respective offices by the people of the State. The enabling act clearly contemplates the exercise of discretion by these representative boards and, as admitted by respondents, courts will not interfere with such discretionary powers of a subordinate governmental agency except in cases of fraud or clear abuse of power or where unreasonable or capricious. Schroeder v. O'Neill, 179 S.C. 310,184 S.E. 679. The allegations of fact contained in the complaint are not reasonably susceptible of the inference of fraud, folly, abuse of power or caprice, and we conclude without difficulty that no such cause of action is stated.
It is further contended that the transactions alleged will amount to the acquisition by appellant of a completed transmission system and run afoul of the decision in Creech v.S.C. Public Service Authority, 200 S.C. 127,20 S.E.2d 645. However, there ban was declared against the acquisition by appellant of the properties of one of the respondents in this action which include operating hydro and steam generating plants and the electric, gas and bus transportation system of the City of Columbia, which is a very far cry from the transaction under review. Here appellant is pursuing one of its express statutory powers to provide lines for the transmission of power generated by it. There is little similarity between the two, certainly not such as will bring the present activity within the rule of the Creech case.
A sentence of Code Sec. 8555-13 (21) is cited as barring the proposed enterprise, as follows: "It is intended that the project to be developed hereunder and any and all projects undertaken * * * shall be financed as self-liquidating projects and that the credit and taxing powers of the State * * * shall never be pledged to pay said debts and obligations." *Page 213 
It is reasonably inferable from the allegations of the complaint that this "project" will be self-liquidating within the terms of the law. The lines to be constructed will be conduits for the transmission of appellant's power for sale and it is fairly deducible from the complaint that the funds for the debt service and maintenance which will be provided by appellant will be derived from its sales of energy transmitted over the lines. Moreover, the word "project" has a meaning which is not applicable to the construction and maintenance of transmission lines; it will be referred to in more detail hereinafter.
It is still further contended that appellant's plan to maintain the proposed transmission lines and provide service upon the debt for the construction of them will violate the implication of the terms of Code Sec. 8555-13 (15) which is a grant of express power to appellant to "endorse or otherwise guarantee the obligations of any corporation all of the voting stock of which" appellant may own or acquire. The argument is that the transaction under attack is a guaranty by appellant of the loan to Central Electric by means of which the transmission lines will be construed. But that allegation of fact is not contained in the complaint. Rather, the allegation is of a direct obligation of appellant to pay the accruals of principal and interest on the construction loan and thereby acquire title to the lines. Instead of an endorser appellant will be a purchaser on an installment plan.
Finally included in this broadside attack is the assertion that the construction of the proposed transmission lines into the territories of respondents should be considered a "project" and come within the ban of the enabling act against the development of such above the confluence of the Board and Saluda Rivers and upstream on the Wateree River beyond Camden. "Projects" as here used plainly means the development of the natural resources of power and navigation and has no reference to the transmission of electric power which is produced by appellant in the exercise of the powers granted in its enabling act. Its meaning *Page 214 
is referred to in Creech v. S.C. Public Service Authority,supra, 200 S.C. 127, 20 S.E.2d 645, 652.
This conclusion against the contention of ultra vires
is reached in full realization of the rule stated in theCreech case, just cited, as follows: "Only such powers as are reasonably necessary to enable corporations to carry out the express powers granted and the purposes of their creation are to be implied or are to be deemed to be incidental. Accordingly, an incidental power may be defined to be one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has merely some slight or remote relation to it. Powers merely convenient or useful are not implied if they are not essential, having in view the nature and object of the incorporation. 13 Am. Jur. § 740, page 773." In view of the provisions of the enabling act, to which references have been made, we do not think that it can be reasonably contended that appellant is not authorized by law to procure the construction of the lines as described in the complaint, over which its product will be delivered to its customers.
It is argued that the indicated decision will make of appellant a law unto itself. The obvious answer is that appellant is, in effect, a State agency just as the Public Service Commission is and both are subject to constitutional legislation which may be enacted by the General Assembly of the State. Appellant undertook to exercise powers in excess of statutory grant and was enjoined by the court from its intended acquisition of all of the properties of the respondent first named above, which has been mentioned.Creech v. S.C. Public Service Authority, supra,200 S.C. 127, 20 S.E.2d 645. Of interest here, we said in that case: "The intention is easily discovered from the act that the power generated by the Pinopolis Dam would be sold not only in the lower part of the State, but throughout its length and breadth." *Page 215 
We repeat the trite observation that courts are not concerned with the policy or wisdom of the law but only with its validity and meaning; or, more specifically in this case, with the acts of appellant except to determine the legality of them when challenged, as here.
The foregoing sustention of appellant's question I and the overruling of respondents' sustaining grounds require affirmative answer to question II. It was error to overrule the demurrer for the supposed reason that the complaint stated a cause of action for a declaratory judgment. It did contain the statement of that conclusion and prayed for that form of relief in addition to injunction, but tested by demurrer on the general ground it is found that the complaint contains no allegations of fact which warrant any present or future coercive relief to respondents. In these circumstances it would be a useless waste of the time, expense and effort of all concerned to go through the form of a trial, and add to the "law's delays". Such was not intended by the Uniform Declaratory Judgments Act, 45 Stat. 2014. It does not purport to abolish the office of a demurrer. Judgment for appellant on demurrer to the merits, as in this case, is, indeed, a declaration that respondents, upon the allegations of the complaint, are not entitled to any relief in law or equity. In this sense, all judgments are declaratory in nature.
Declaratory judgments are the subject of A.L.R. annotations too numerous to cite, as reference to the indices will show. There is a recent informative article in 62 Harv. Law Rev. 787. The decisions which we have read uniformly hold that the existence of an actual controversy is essential to jurisdiction to render a declaratory judgment. Where a complaint is devoid of allegations which are sufficient to establish the existence of a right in plaintiff arising out of the matters alleged, a cause of action for declaratory judgment is not stated, and the complaint is demurrable. That is the situation here and the demurrer on the general ground should have been sustained. *Page 216 
This conclusion is supported by a quotation in the circuit order from a leading text. Anderson on Declaratory Judgments, page 28, as follows: "Where a concrete issue is present, and there is a definite assertion of legal rights and a positive legal duty with respect thereto, which are denied by the adverse party, there is a justiciable controversy calling for the invocation of declaratory judgment action." Here the complaint contains no "assertion of legal rights and a positive legal duty with respect thereto", but on the contrary it affirmatively shows that respondents are entitled to no form of relief whatever.
The stated dispositions of questions I and II and of respondents' sustaining grounds make moot the issue embraced in question III and it need not be considered. The case will be remanded for entry of order sustaining the demurrer to the complaint.
Reversed and remanded.
BAKER, C.J., and FISHBURNE, TAYLOR and OXNER, JJ., concur.