SOUTH CAROLINA PUBLIC SERVICE AUTHORITY v. NEW YORK CASUALTY CO.

Civil Action No. 1758.

District Court, E. D. South Carolina, Charleston Division.

Nov. 21, 1947.

See also 74 F.Supp. 840.

W. D. Simpson, of Moncks Corner, S. C., Edgar A. Brown, of Barnwell, S.C., and Dennis & Dennis, of Moncks Corner, S.C., for plaintiff.

John I. Cosgrove, of Charleston, S. C. and Thomas, Cain & Black, of Columbia, S. C., for defendant.

WARING, District Judge.

South Carolina Public Service Authority (hereinafter referred to as Authority) commenced its suit against the New York Casualty Company (hereinafter referred to as Casualty Company), a corporation organized and existing under the State of New York, which has representatives, and does business, in the State of South Carolina. The action was commenced in the Court of Common Pleas for Berkeley County, South Carolina, and the complaint alleges the organization and existence of the plaintiff as a part of the government of the State of South Carolina, and the cause of action is stated to be for the breach of a bid bond given to insure the execution of a contract by the Wright Contracting Company, which had bid for the performance of certain work on the slopes of dikes and dams of the project constructed by and under the control of the Authority and commonly known as the Santee-Cooper Project. It is alleged that the Wright Contracting Company had made a bid for the contract and had been awarded the same and had failed and refused to comply, thereby causing loss to the Authority; and judgment is prayed on the bond in the sum of $191,140.

By appropriate proceedings the defendant Casualty Company served its petition and bond for removal of the cause to the Federal Court on the ground of diversity of citizenship. There is no federal question alleged and the sole ground for removal is the diversity of citizenship of the two parties, plaintiff and defendant. There is no question but that the Casualty Company is a non-resident of the State of South Carolina, and if the plaintiff is, as claimed, a South Carolina corporation, the cause is removable. But on behalf of the plaintiff, it is claimed that the Authority is a public body and is in effect the State of South Carolina. The issue to be considered and passed upon therefore is narrowed to the consideration of the plaintiff's creation, organization and status.

■ If it is found that the plaintiff is a corporation and an entity separate and apart from the State of South Carolina, and not merely a part, branch, or department of the State, then the cause must remain in this court, which would have jurisdiction of the same. On the other hand, of course if it is deemed that the plaintiff is merely a part of the State of South Carolina and the State is in effect the true plaintiff, then the cause must be remanded to the State Courts of South Carolina, since under the 11th Amendment to the Constitution of the United States, a state cannot be made a party in Federal Court against its will.

"A state is not a citizen. And under the judiciary acts of the United States it is well settled that a suit between a state and a citizen or a corporation of another state is not between citizens of different states." Postal Telegraph Cable Co. v. State of Alabama, 155 U.S. 482–487, 15 S.Ct. 192, 194, 39 L.Ed. 231.

The South Carolina Public Service Authority was created by and owes its existence to acts of the General Assembly of the State of South Carolina adopted in 1934, which will be found in the South Carolina Code 1942, §§ 8555-11 to 8555-24 inclusive. The more pertinent parts of these acts are as follows:

"Sec. 8555-11. Created—offices.—There is hereby created a body corporate and politic to be known as the South Carolina Public Service Authority (herein called the "public service authority"), with a principal office in the city of Columbia, county of Richland, South Carolina, and such branch offices in the state of South Carolina as the directors may determine."

This section was amended in 1944, Code Supp.1944, § 8555-11, by changing the principal office from the City of Columbia in the County of Richland to the Town of Moncks Corner in the County of Berkeley.

"Sec. 8555-12. Directors—advisory board. —Such public service authority shall consist of a board of seven directors to be appointed by the Governor, one from each congressional district of the State, and one from the State at large who shall be chairman. Each director shall serve for a term of seven years, and until his successor has been appointed and qualified, except that the initial terms of the directors shall be respectively one, two, three, four, five, six and seven years. * * *"

This section provides for the determination of the length of terms and for filling unexpired terms, and further provides that actual expenses shall be paid from funds advanced from the contingent fund of the Governor until the Authority has funds to reimburse, and after that all expenses shall be paid from its funds. The section further provides for the appointment of a board to be known as "the advisory board of the South Carolina public service authority," to be composed of the Governor, the Attorney General, the State Treasurer, the Comptroller General, and the Secretary of State, and shall consult and advise with the board of directors.

"Sec. 8555-13. Powers.—The public service authority shall have power to develop the Cooper River, the Santee River, and the Congaree River in this State, as instrumentalities of intrastate, interstate and foreign commerce and navigation; to produce, distribute and sell electric power; to reclaim and drain swampy and flooded lands; and to reforest the water sheds of rivers in this State; and shall also have all powers which may be necessary or convenient for the exercise of such powers, including, without limiting the generality of the foregoing, the following powers:

"(1) To have perpetual succession as a corporation.

"(2) To sue and be sued.

"(3) To adopt, use and alter a corporate seal.

"(4) To acquire, purchase, hold, use, lease, mortgage, sell, transfer, and dispose of any property, real, personal or mixed, or any interest therein.

"(5) To build, construct, maintain and operate canals, dams, locks, aqueducts, reservoirs, draw-spans, ditches, drains and roads, and to lay and construct any tunnels, penstocks, culverts, flumes, conduits, mains and other pipes necessary or useful in connection therewith.

"(6) To divert waters from the Santee River by means of a canal or canals, flume or flumes or otherwise, and to construct and maintain a dam of any height or size for the purpose of impounding said waters and to discharge the same into the Cooper River or otherwise.

"(7) To build, acquire, construct and maintain power houses and any and all structures, ways and means, necessary, useful or customarily used and employed in the manufacture, generation and distribution of water power, steam electric power, hydro-electric power and any and all other kinds of power, including power transmission lines, poles, telephone lines, substations, transformers, and generally all things used or useful in the manufacture, distribution, purchase and sale of power generated by water, steam or otherwise.

"(8) To manufacture, produce, generate, transmit, distribute and sell water power, steam electric power, hydro-electric power or mechanical power within and without the State of South Carolina.

"(9) To reclaim and drain swampy and flooded lands.

"(10) To reforest the water sheds of the Cooper, Santee and Congaree Rivers and to prevent soil erosion and floods.

"(11) To make by-laws for the management and regulation of its affairs.

"(12) To appoint officers, agents, employees and servants, to prescribe their duties, and to fix their compensation.

"(13) To fix, alter, charge and collect tolls and other charges for the use of their facilities of, or for the services rendered by, or for any commodities furnished by, the public service authority at rates to be determined by it, such rates to be at least sufficient to provide for payment of all expenses of the public service authority, the conservation, maintenance and operation of its facilities and properties, the payment of principal and interest on its notes, bonds and other evidences of indebtedness or obligation and to fulfill the terms and provisions of any agreements made with the purchasers or holders of any such notes, bonds or other evidences of indebtedness or obligation.

"(14) To borrow money, make and issue negotiable notes, bonds and other evidences of indebtedness of the public service authority and to secure the payment of such obligations or any part thereof by mortgage, lien, pledge, or deed of trust, on all or any of its property, contracts, franchises or revenues, and to make such agreements with the purchasers or holders of such notes, bonds, or other evidences of indebtedness, or with others in connection with any such notes, bonds or other evidences of indebtedness, whether issued or to be issued, as the public service authority shall deem advisable, and in general to provide for the security for said notes, bonds or other evidences or indebtedness and the rights of the holders thereof.

"(15) To endorse or otherwise guarantee the obligations of any corporation all of the voting stock of which the public service authority may own or acquire.

"(16) Without limitation of the foregoing to borrow money from the United States government or any corporation or agency created, designed or established by the United States.

"(17) To make contracts of every name and nature and to execute all instruments necessary or convenient for the carrying on of its business.

"(18) To have power of eminent domain.

"(19) To mortgage, pledge, hypothecate or otherwise encumber all or any of the property, real, personal, or mixed, or facili-

ties, or revenues of the public service authority as security for notes, bonds, evidences of indebtedness or other obligations of the public service authority.

"(20) To do all acts and things necessary or convenient to carry out the powers granted to it by §§ 8555-11 thru 8555-24 or any other acts.

"(21) To investigate, study and consider all undeveloped power sites and navigation projects in the State and to acquire and/or develop the same as need may arise in the same manner as herein provided. *Provided, always* nevertheless; that said investigations, studies and considerations of said South Carolina public service authority herein created shall be limited to the Congaree River and its tributaries below the confluence of the Broad and Saluda Rivers and the Wateree tributary of the Santee River at and near a point at or near Camden, South Carolina. *Provided, however,* that the public service authority shall have no power at any time or in any manner to pledge the credit and/or the taxing power of the State or any of its political subdivisions, nor, shall any of its obligations or securities be deemed to be obligations of the State or of any of its political subdivisions; nor shall the State be legally, equitably or morally liable for the payment of principal of and/or interest on such obligations or securities. * * *"

This section further authorizes the issuance by the Authority of negotiable bonds and mortgages to secure the same, and provides that the same may provide for a franchise for the operation of the property and the business of a public service authority by any person "acquiring the mortgaged property or any part thereof upon foreclosure."

Section 8555-14 provides remedies in case of failure to pay the bonds of the Authority by mandamus or other suit, and gives power to insert in a mortgage or other security that in the event of suit a receiver may be appointed to take possession of the properties of the Authority and operate the same.

"Sec. 8555-18. Purpose—declaration of public interest—property and securities nontaxable—sale of electrical energy—make certain payments in lieu of taxes.—The public service authority is created primarily for the purpose of developing the Cooper River, the Santee River, the Congaree River and their tributaries upstream to the confluence of the Broad and Saluda Rivers and upstream on the Wateree River to a point at or near Camden and other similar projects as instrumentalities of intrastate, interstate and foreign commerce and navigation; of reclaiming waste lands by the elimination or control of flood waters, reforesting the water sheds of such rivers and improving public health conditions in those areas. It is hereby found and declared that the project authorized by §§ 8555-11 thru 8555-24 is for the aid of intrastate, interstate and foreign commerce and navigation, and that such aid and improvement of intrastate, interstate and foreign commerce and navigation and the development, sale and distribution of hydroelectric power is in all respects for the benefit of all the people of the State of South Carolina, for the improvement of their health and welfare and material prosperity, and is a public purpose, and being a corporation owned completely by the people of South Carolina and operated by said authority for the benefit of all the people of the State, the public service authority shall be required to pay no taxes or assessments upon any of the property acquired by it for this project or upon its activities in the operation and maintenance thereof, except as hereinafter provided. * * *"

Provision is made for the payment by the Authority of sums to the various counties in which it operates of sums equivalent to the amount paid for taxes on properties taken or acquired by the Authority.

"Sec. 8555-19. Net earnings—use.—The South Carolina public service authority is a corporation, completely owned by and to be operated for the benefit of the people of South Carolina, and any and all net earnings thereof not necessary or desirable for the prudent conduct and operation of its business or to pay the principal of and interest on its bonds, notes or other evidences of indebtedness or other obligations or to fulfill the terms and provisions of any agreements made with the purchasers or holders thereof or others shall be paid over semi-annually to the state treasurer for

the general funds of the State and shall be used to reduce the tax burdens on the people of this State."

"Sec. 8555-21. Credit and taxing power of the State and its subdivisions not involved—not liable for payment of securities.—Nothing contained in the provisions of §§ 8555-11 thru 8555-24 shall, at any time or in any manner, involve the credit and taxing power of the State of South Carolina, or of any of its political subdivisions; nor shall any of the securities or other evidences of indebtedness authorized to be issued in and by §§ 8555-11 thru 8555-24 ever be or constitute obligations of the State of South Carolina or of any of its political subdivisions; nor shall the State of South Carolina or any of its political subdivisions ever be liable or responsible, in any way, for the payment of the principal or interest of or on such security or other evidences of indebtedness."

"Sec. 8555-22. State and its subdivisions never levy taxes or appropriate for project.—It is hereby declared that the State of South Carolina and any of its political subdivisions shall never levy any tax to pay any obligations incurred in building this project or make any appropriation to carry on the work of developing the Santee-Cooper power project."

"Sec. 8555-28. Columbia Canal.

"(1) Right of State complete Columbia Canal transferred.—The right of the State of South Carolina to complete the Columbia Canal from its present terminus at Gervais Street to the Congaree River hereby is assigned and transferred to the South Carolina public service authority in order that the canal may be completed, *provided, however,* that the legal title to the said premises shall forever remain in the State of South Carolina.

\*    \*    \*    \*    \*    \*

"(4) Liability of State.—Nothing contained in the provisions of this section shall at any time or in any manner involve the credit or taxing power of the State of South Carolina, or of any of its political subdivisions."

The plaintiff has moved to remand and filed a traverse to which are attached affi-davits of the Governor of the State of South Carolina and of the Chairman of the Board of Directors of the Authority, in which they in effect state that the Authority is a branch of the State government. In my opinion, however, these are merely statements by administrative officers of the Authority giving the same view that their counsel have advised and they are not to be given the weight of legal or governmental authority. Likewise, the defendants points out that the plaintiff has apparently only recently taken the position that it is a part of the governmental machinery of the State of South Carolina since it has appeared several times in this court without setting up any governmental immunity. In the case of Robert Lee, Inc., v. Midland Constructors, Inc., and South Carolina Public Service Authority (C/A 858 in this court (1942) [1], the Authority made no objection to the jurisdiction of this court. In South Carolina Public Service Authority v. Central Engineering Company (C/A 491 (1941) [1], the present plaintiff instituted a suit in this cause alleging that it was "a body corporate and politic, organized under the laws of the State of South Carolina * * * and the plaintiff is a resident and citizen of the State of South Carolina." Two cases are cited which originated in this court and which reached the Circuit Court of Appeals for the Fourth Circuit wherein the Authority has litigated matters on the merits without raising the question of its governmental immunity. South Carolina Power and Light Company v. South Carolina Public Service Authority, 4 Cir., 1938, 94 F.2d 520; Oakland Club v. South Carolina Public Service Authority, 4 Cir., 1940, 110 F.2d 84.

■■ But however persuasive may be the actions of the parties or their positions in other cases, or even in this same case, that would not be binding. As a matter of fact, actual consent cannot give jurisdiction of the subject matter if no jurisdiction existed. The duty of a court is, of its own motion, even if not moved by either party, to examine the sufficiency of a plea to the jurisdiction so as to take care that there is no use of "the judicial power of the

---

[1] No opinion for publication.

United States in a case to which the constitution and laws of the United States have not extended that power." Mansfield C. & L. M. Railway Co. v. Swan, 111 U.S. 379–384, 4 S.Ct. 510, 512, 28 L.Ed. 462, quoting with approval from Dred Scott case, Dred Scott v. Sanford, 19 How. 393–400, 15 L.Ed. 691, and citing Capron v. Van Noorden, 2 Cranch 126, 2 L.Ed. 229.

In the above noted case of Oakland Club v. South Carolina Public Service Authority, the following is quoted from the opinion of the court, speaking through Circuit Judge Dobie [110 F.2d 85]:

"Since the condemnor and condemnee *were both corporations (citizens) of the State of South Carolina,* the only basis for the jurisdiction of the Federal Court in the condemnation proceedings was under the Federal Power Act. The condemnor, however, elected to proceed in the Federal Court to acquire its rights under the provisions of the Eminent Domain Act of the State of South Carolina." (Emphasis added)

While it is pointed out in argument that the last named statement by the Circuit Court of Appeals was not a part of the issue adjudicated and might be considered as a dictum, nevertheless, I cannot feel that that court would so casually pass upon a matter of such importance and not give due consideration and weight to its words describing one of the parties and distinctly holding that the jurisdiction must rest squarely upon a federal question since there was not diversity of citizenship and that the court would of its own motion have directed dismissal for lack of jurisdiction.

The motion has been argued at great length and I have been furnished with voluminous briefs which show great industry in search for every available authority. It would be of little use to attempt to cite and analyze every case that has touched upon or approached the matter here under consideration. A large number of those cited will be found in a very valuable and voluminous note in 147 A.L.R. 786. And while I have given due consideration to these, there are only two or three that seem to me need be referred to at this time as guide posts to reach a proper determination of the issues at bar. After all, it must

be realized that not many of these cases are closely in point since most of them arise from different states and relate to different types of organizations. While many are similar, almost everyone can be differentiated in some respect, either major or minor, from the Authority in this case.

On the one side, the argument is stressed that this Authority is substantially the same as other departments of the State of South Carolina and similar to departments of other states where some business or function is delegated to a commission, board, or some type of government body, whatever may be its name, to carry on the duties and functions of the state government. Frequent reference is made to the South Carolina State Highway Department; the former South Carolina Dispensary for the control and sale of alcoholic liquors; the Tax Commission, and other State agencies. On the other hand, reference is made to semi-business organizations created by various states such as turnpike companies, water works, and particularly to municipal corporations, counties and limited geographical groups.

■ In a great many states, there is a doctrine that activities by a state or political subdivision are sometimes to be classified as *governmental* and sometimes as *business;* and some of the courts have differentiated the status of the political entity when engaged in one or the other of these classifications. However, in South Carolina this distinction is not used and all activities by the State or by any subdivision are part of the governmental function. Irvine v. Town of Greenwood, 89 S.C. 511, 72 S.E. 228, 36 L.R.A.,N.S., 363; Farrow v. City Council of Charleston, 169 S.C. 373, 168 S.E. 852, 87 A.L.R. 981.

■ In the first place, we must determine what law governs the answer to this question. It is unnecessary to cite authorities to the effect that the federal courts are the arbitrators of their own jurisdiction and are governed by federal law and decisions, but that of course great weight and deference should be shown to state decisions that may affect the exact question or very similar matters. It is, therefore, proper that we first examine what, if anything, the South

Carolina courts have had to say about the Authority. The first case that arose was in 1935 shortly after the enactment of the statutes above referred to creating the Authority.

In that case, Clarke v. South Carolina Public Service Authority, 177 S.C. 427, 181 S.E. 481, the South Carolina Supreme Court passed upon the constitutionality of the act creating the Authority. The case was brought for the purpose of testing various constitutional questions and determining whether or not the Authority had the power to issue bonds and mortgages and the validity of the same. But the case itself is of practically no help to us in determining the questions at bar. The court outlines the act creating the Authority and states its purposes and what it is to do, but it is practically in the language of the act and about all that is decided is that the Authority is a legal entity and that the General Assembly was authorized and had the power to give to it the rights, powers and duties in the creating act.

In the case of Creech v. South Carolina Public Service Authority, 200 S.C. 127, 20 S.E.2d 645, 648, the Supreme Court of South Carolina again passed upon certain of the rights and powers of the Authority. It appears that the Authority desired to purchase certain private power companies operating in and above Columbia, South Carolina, and this suit was brought to enjoin the Authority from so doing. In that case the court says:

"In our opinion, the South Carolina Public Service Authority is a public corporation in the nature of a quasi municipal corporation, exercising certain governmental functions as an agency of the State. Floyd v. Parker Water & Sewer Sub-District, 203 S.C. 276, 17 S.E.2d 223. As such, the powers conferred are to be strictly construed, and any fair, substantial and reasonable doubt concerning the existence of any power or any ambiguity under the statute upon which the assertion of such power rests, is to be resolved against the corporation, and the power denied. Luther v. Wheeler, 73 S.C. 83, 52 S.E. 874, 4 L.R.A.,N.S., 746, 6 Ann.Cas. 754."

The court holds that the Authority is strictly limited to the purposes set forth in the act creating it and holds that it is limited by the territorial description in Section 3 of the "Powers of the Authority." See Section 8555-13, Subdivision (21), hereinabove quoted. While not determinative, the Creech case seems to place the Authority very much in the same class as municipal corporations and certainly shows that its duties are not state-wide. Its reference to the case of Floyd v. Parker Water & Sewer Sub-District, supra, would seem to indicate that it does not consider the Authority as the State itself but rather as a limited entity and in the same class with counties, municipalities, and other limited organizations, which, although having public powers, are not branches of the State and cannot claim the immunity that the State has.

None of these decisions state that the Authority is actually an agency of the State and a part of the State government. The State may well delegate certain portions of its governmental authority to some entity that it creates. The counties, municipalities of the State, all derive their powers and authority from State and exercise certain governmental authority that is very much like that of the State, yet that does not deprive them of their own legal existence or give the same immunity that the State has, or let them set up immunity from suit in the federal court under the proper circumstances. The plaintiff also relies considerably upon the case of State of South Carolina Ex Rel John M. Daniel, Attorney General, v. Atlantic Coast Line Railroad Company,[1] which was a proceeding commenced in the original jurisdiction of the Supreme Court of South Carolina and is not shown in the reported cases. This action was terminated by an Order of the Supreme Court May 15, 1941. The case was brought to require the railroad to remove a bridge which hampered the construction of a canal or "tail race" being constructed by the Authority. The railroad raised the objection that the Authority should be made a party and the court held that the State through its Attorney General could bring an action to make the railroad remove something that it claimed was an obstruction to work being

---

[1] No opinion for publication.

done under authority of the State statutes. But I do not see where the decision would have great weight on the issue here since there could be no question but that the State itself, through its own Attorney General, would have a right to bring an action against any one interfering with work being performed as a result of its statutory authority.

Fowler v. California Toll-Bridge Authority, 9 Cir., 128 F.2d 549, has been cited and strongly relied upon by the Authority; whereas the defendant points out that the case of Hunkin-Conkey Construction Co. v. Pennsylvania Turnpike Commission, D.C., 34 F.Supp. 26, is almost directly in point with the case at bar. The Hunkin-Conkey case was considered and adverted to in the opinion of the Fowler case and the situations in the two cases shown to be quite different. In the Fowler case the act of the State of California created a Toll-Bridge Authority as a separate entity and suable, but it was clearly shown that this Authority, consisting of a Board of State officials acting without compensation, was performing a State function, namely passing upon the acquiring and constructing of toll bridges and eventually freeing the same. The Authority issued revenue bonds, which it is true were not obligations of the State, but which were to be retired and then the toll bridges would be freed. The bridges were the property of the State. They were to be constructed by and under the management of State Departments. The moneys were delivered through State officials, and the funds went into the State Treasury. In the Hunkin-Conkey case, the State of Pennsylvania created a Turnpike Commission which took title to property, employed men to collect tolls, and managed and operated the turnpike. An examination of the two cases and of the rights, powers, duties, and evident intention of the legislatures of the two States shows that the situations were entirely different. In California it was clearly intended that the Toll-Bridge Authority was merely an instrumentality and board through which the State of California was carrying on one of its governmental functions, namely, to construct and maintain bridges and after paid for by col-

lection of tolls, they were to become free to all users and to be carried on and maintained by the State. In Pennsylvania, the Commission created had a distinct corporate entity and it appointed its own officers, ran its own business, and was entirely separate from State domination.

It seems to me that the two foregoing cases clearly illustrate the differences of opinion and the different situations to be considered in this case. The Hunkin-Conkey case is almost identical with the one under consideration. Of course none of these cases are controlling but the facts and reasoning in that case appeal very strongly to me in considering the status of the Authority here.

The plaintiff also lays great stress upon the case of Howell v. Port of New York Authority, D.C., 34 F.Supp. 797. The Port of New York Authority is an organization acting for the States of New York and New Jersey and created by statutes enacted by the two States. It is significant that each State specifically retains the power to veto any of the acts of the commissioners and therefore it is clearly seen that this Authority is not an independent entity and is entirely different from the South Carolina Authority.

The plaintiff also cites Suncrest Lumber Company v. North Carolina Park Commission, 4 Cir., 29 F.2d 823, as an authority directly in point and perhaps controlling upon this court. That was a case which was taken to the Circuit Court of Appeals for the Fourth Circuit and decided on November 7, 1928 (Opinion by Parker, Circuit Judge). But an examination of the case discloses that the North Carolina Park Commission was an organization wholly and distinctly different from the plaintiff in this case. The Commission was unquestionably granted the exercise of certain sovereign powers and acted for the state. The commissioners had the power to have the treasurer of the state issue $2,000,000 in bonds *on the credit of the state* and to exercise full control over the proceeds and *to purchase land in the name of and for the benefit of the state.*

Dozens of other cases, many of which are referred to in the note in 147 A.L.R.

hereinabove referred to, have been cited and discussed by the parties in briefs and in oral argument, and I have carefully examined these. As heretofore stated, they present considerable conflicts and almost all of them show some variation in terms or conditions from the one under consideration here. While they have been helpful, they are hardly determinative. I am therefore of the opinion that in the absence of any controlling authority on the subject, I have to decide this question upon my own reading of the act and determination of its meaning.

It is very significant, as was pointed out in the Creech case, supra, that the Authority is strictly limited to the projects to be developed, both as to developing new projects and as to the territory to be developed. It is clear that the General Assembly intended to limit this organization which it had created and had no intention of making it a state-wide operator. The Authority, being desirous of spreading its operations and business, attempted to acquire certain private corporations engaged in the business of transmitting and selling electric power. As was pointed out in the Creech case, attempts were made to enact statutes giving this power, but these attempts failed. Thereupon the Authority took the position that it had these powers as incident to the powers granted in its incorporation, but the Authority was rather sharply rebuked by the Supreme Court in the Creech case where it was pointed out that its powers were strictly limited by the terms of the act. The opinion in this case clearly shows that the court treated the Authority as a quasi-corporation, whose powers are to be strictly limited, rather than an agency which is a part of the State government which would be given much wider powers and discretions.

The oft-cited case of Cowles v. Mercer County, 7 Wall. 118, 19 L.Ed. 86, decided that a municipal corporation (in that case a county in the State of Illinois) may be sued in the courts of the United States by citizens of another state. The court, speaking through Chief Justice Chase, definitely decided that the Board of Supervisors of Mercer County could be sued in a federal court by non-resident citizens and says 7 Wall., at page 121, 19 L.Ed. 86:

"The Board of Supervisors is a corporation created by acts of the legislature of Illinois."

And again, 7 Wall., at page 122, 19 L.Ed. 86:

"The power to contract with citizens of other states implies liability to suit by citizens of other states, and no statute limitation of suability can defeat a jurisdiction given by the constitution."

On consideration of the act itself and all of its terms and in the light of the various decisions cited by counsel, some of which are referred to herein, I have reached the conclusion that the Authority is not a branch or department of the State of South Carolina. The act clearly shows that it was intended to be a separate entity; its funds were not in any way to be commingled with those of the State; the State was expressly freed from any responsibility for the debts or obligations of the Authority, this fact being stated several times throughout the act; the projects to be handled by the Authority were not to be State-wide but were limited with strict geographical bounds. All of these indications lead undoubtedly to the conclusion that the act of the General Assembly of South Carolina created the Authority as a separate, corporate entity, with certain public functions and duties; or, in other words, as has been several times said, a quasi-municipal corporation with the power to sue and be sued, handle its own contracts and do all things necessary within the purview of the statutes and within the territorial limits fixed. Such an organization is not a department of the State, is not entitled to the State's immunity from suit, but is a citizen of the State of South Carolina and in litigation with a non-resident is subject to the laws of the United States providing for the removal of causes to the United States Court upon the ground of diversity of citizenship.

I am therefore of the opinion that the motion to remand should be refused and this court should retain jurisdiction of the cause. An appropriate Order will be entered to that effect.